## CESSNA *v.* UNITED STATES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 78. Argued and submitted January 4, 1898. — Decided February 21, 1898.

The decision of the Court of Private Land Claims that the ayuntamiento of El Paso had no power to make a grant, like the one in controversy in this case, entirely outside of the four square leagues supposed to belong to El Paso, and that even if it had such power, the conditions of the alleged grant were never performed by the grantee, and therefore that he acquired no title to the property, was correct.

On January 9, 1893, the appellants as plaintiffs filed their petition in the Court of Private Land Claims, praying that their title to a tract of land in the Territory of New Mexico, and near to the city of El Paso, Texas, be confirmed. The plaintiffs named as defendants, besides the United States, the unknown owners of the Dona Ana Bend Colony, Mesilla Colony and Bracito Grants. The United States as well as certain individuals representing themselves to be the owners of these grants appeared and answered. Thereafter a trial was had, and on June 26, 1895, the court entered a decree, finding that the plaintiffs' claim of a land grant had not been sustained by satisfactory proof, and dismissing the petition. From such decree the plaintiffs brought this appeal.

The facts disclosed by the record, and about which there is little dispute, were substantially as follows: In April, 1823, one Doctor John Heath, or Juan Gid, as his name is written in the Spanish, petitioned the ayuntamiento or general council of El Paso for a grant of a tract of land, which petition was acted upon by the ayuntamiento, and a tract five leagues square was granted to him. This petition was in these words:

"Dr. Don Juan Gid, citizen of the United States of North America, in the best legal form allowed by law, appears before your honorable body and states: That, not having received up to date any answer to the communication of December last of last year, which I presented to the former

ayuntamiento, the predecessor of your honorable body, which (communication), approved in all its parts, was forwarded to His Imperial Majesty by the same, for which reason and because of the increase (ampleacion) of the power which is given to your honorable body by the law of colonization which was issued by the National Instituent Assembly (Junta) of the Empire on the 3d of January of the present year. For these reasons I again have recourse through this, repeating my request to your honorable body, adding that I offer to bring for the settlement of the land of El Bracito, which I ask may be given to me, thirty families of Christian Catholics, and among them blacksmiths, gunsmiths, silversmiths, carpenters, tailors, shoemakers, saddlers, architects, mathematicians, chemists, mineralogists, surgeons, doctors of medicine, and to establish a hospital with its corresponding drug store and proper stock therein, with the necessary instruments for all operations; also to build a warehouse supplied with all kinds of merchandise for wholesale; the necessary machines for the manufacture of cotton and cloth goods, another for the manufacture of gunpowder, offering, until payment of the expense of transportation, to furnish the amount of this article all this jurisdiction may need at the very low price of one dollar per pound; it being first class for the use of arms; with the understanding that in all the said trades there shall be admitted for instruction the youths whose parents may see fit to dedicate them thereto; the children of this country (suelo) having the preference thereto.

"In view of what has been said and because, for establishing the said machinery, utilizing the farms, grazing stock and for the other field interests, it is indispensable that it have the extension which is necessary therefor, it behooves me to demonstrate to your honorable body that the land which may be assigned to me, limiting me to the smallest amount, be at least enough for (sea lo menos para) an hacienda, and that said designation be made for me on both sides, that is to say, that it be on both sides of El Bracito, because the said land being broken it is necessary to leave out various portions of it. I also propose to your honorable body that, until time

permits whatever else may be desirable, this settlement be attached to the parish of this jurisdiction : likewise that the pasture and woodlands be common, with the same privilege as other people of this locality : recommending that it be without prejudice to those farms (sementeras), and that the petitioner be the person to whom is entrusted the distribution of said lands, he being considered the legitimate justice of said families.

"Candor of mind being what I most appreciate, and to join myself with my brethren, the faithful inhabitants of this Empire, living always in the simple peace, in order to dispel all rumors of hatred, I ask your honors that, you being pleased, and in order that the said law of colonization be executed in all its parts, notice of this, my petition, be given to the individuals of this jurisdiction, in order that all these gentlemen who like may better or equal it with a view to the right of preference, in which act your honorable body, to whom is entrusted the power of father of this country (patria), will weigh at their true value, the incalculable benefits that result from my petition whereupon, far from seeking means to deprive it thereof, it would be encouraged in every way to procure their increase.

"Wherefore, I ask and petition your honorable body to be pleased to accede to what I petition, being pleased to pardon the fault that this my petition is not upon paper of the proper seal, for there is none in this place, I being ready to pay the fees that belong to the national treasury. I protest that I do not act in bad faith, and the necessary, etc.

"Paso, April 7th, 1823.

"JUAN GID."

Certain proceedings were had upon this petition, which it is unnecessary to mention in detail.

On April 22 this order was made by the ayuntamiento :

"This ayuntamiento having on this day received that which by its order was to be executed by the commission appointed from its midst to do the surveying that was to be done in the land of El Bracito, this being five leagues in each direction,

the whole of it composing an ' hacienda,' according to article 5 of the colonization plan; which land was granted by this ayuntamiento to Don Juan Gid for the purpose of settlement as stated afterwards, and he being satisfied with what was done in all its parts by the said commission, it was entered as a minute in due witness thereof the president and other members of which that is composed signing it before me, the secretary, to which I certify. José Ygnacio Rascon, José Morales, José Maria Belarde, José Francisco Carbajal, Juan Maria Barela, Antonio Prudencio, José Maria Garcia, Saturnino Aguiar, José Manuel Garcia, Lorenzo Provencio, José Albares.

"JUAN MARIA PONCE DE LEON, *Secretary.*"

And on the 25th the following:

"The present expediente in which there has been granted to Don Juan Gid, Anglo-American of the United States, the lands of El Bracito for settlement being considered by this ayuntamiento as closed, proceed to what is to be done under the tariff in force in this ayuntamiento and by its secretary that Juan Gid may know what fees he is to pay for what has been done therein placing the original in the archive as a perpetual testimony, but nevertheless to this shall be sent, together with a certified copy, by the first mail or safe-conduct to the governor of this province for his superior information; another of the same kind being given to the party in interest for his protection. And by the present order the president and members of this corporation so determined and signed it, before me, the secretary, to which I certify. José Ygnacio Rascon, José Morales, José Maria Belarde, José Francisco Carbajal, Saturnino Aguiar, José Manuel Garcia, Lorenzo Provencio.

"JUAN MARIA PONCE DE LEON, *Secretary.*"

"It is a copy of the original expediente which on petition of Don Juan Gid was made in order to grant to him for settlement the land of El Bracito, in accordance with the colonization plan, together with what is afterward stated: which original remains accordingly in the archive, to which I certify.

"JUAN MARIA PONCE DE LEON, *Secretary.* [RUBRIC.]"

A copy of these proceedings was sent to the governor of the province, and the following action was taken by the provincial deputation:

"In the session of the 17th of the present month the acting governor of this province, Captain José Antonio Vizcarra, presented to this deputation the reports which your honorable body makes to him in an undated official communication which said chief received; and he also presented another official letter, dated the 26th of last April, accompanied by a copy of the proceedings had by your honorable body in giving to the foreigner Mr. John Heath, at the Bracito, possession of land belonging to the people of that jurisdiction.

"The deputation in the same session resolved to express to your honorable body the surprise it felt at the violent and mistaken procedure with which you conducted yourselves in giving land to foreigners, not only with prejudice to the inhabitants of that jurisdiction, but also in violation of the same law of which your honorable body availed itself in order to carry into effect the possession referred to, thus opening the door to the continual complaints of its people: this deputation refraining from making other observations to your honorable body, on account of the colonization law, which was the moving cause in the concession of the Bracito land to the said Heath having been repealed; but proceeding to direct your honorable body that, in order not to make itself responsible for damages which the foreigner might claim if he should introduce into this province the families that he offers to bring, it should notify the said Heath, through the plenipotentiary of the United States resident in New Mexico, or in some other manner which it may deem more prompt and effective, that the possession which has been given to him at the Bracito, belonging to that jurisdiction of El Paso, was through a mistaken opinion and wrong understanding in relation to the colonization law already repealed.

"And I communicate it to you by direction of the said deputation, with the understanding that I shall communicate to you the decision that may be arrived at when the petition

of Mr. Albo and the other persons of that town shall have been discussed, your honorable body notifying me of the receipt of and compliance with these instructions.

"God preserve your honorable body many years.

"Santa Fé, June 19, 1823, the third year of independence and the second of liberty.

"FRANCISCO JAVIER CHAVEZ.   [SCROLL.]

"JUAN BAUTISTA VIGIL.   [SCROLL.]

                    "*Deputy Secretary.*"

It does not appear that notice of this action of the provincial deputation was at the time communicated to Heath, for soon after the final order of the ayuntamiento he returned to this country and to the State of Missouri, of which State he had theretofore been a citizen, made a disposition of his property, and collected a body of colonists, with whom, in the year 1824, he proceeded to El Paso, with a view of taking possession of this tract of land. Instead of being permitted to occupy the tract, he was banished from the country, forced to abandon the property that he had brought with him, and sent back to the United States a bankrupt. He returned to Missouri, where he lived until he died, in the year 1851. Petitioners claim under him.

The national colonization law of January 4, 1823, under which these proceedings were had, is, so far as it can have any application to the present case, translated by Rockwell (Rockwell's Spanish Laws, p. 617) as follows:

"Art. 1. The government of the Mexican nation will protect the liberty, property and civil rights of all foreigners, who profess the Roman Catholic apostolic religion, the established religion of the Empire.

"Art. 2. To facilitate their establishment, the executive will distribute lands to them, under the conditions and terms herein expressed.

"Art. 3. The empresarios, by whom is understood those who introduce at least two hundred families, shall previously contract with the executive, and inform it what branch of industry they propose to follow, the property or resources they

intend to introduce for that purpose; and any other particulars they may deem necessary, in order that with this necessary information, the executive may designate the province to which they must direct themselves; the lands which they can occupy with the right of property, and the other circumstances which may be considered necessary:

"Art. 4. Families who emigrate, not included in a contract, shall immediately present themselves to the ayuntamiento of the place where they wish to settle, in order that this body, in conformity with the instructions of the executive, may designate the lands corresponding to them, agreeably to the industry which they may establish.

"Art. 5. The measurement of land shall be the following: Establishing the vara at three geometrical feet, a straight line of five thousand varas shall be a league; a square, each of whose sides shall be one league, shall be called a sitio; and this shall be the unity of counting one, two or more sitios; five sitios shall compose one hacienda."

"Art. 7. One labor shall be composed of one million square varas, that is to say, one thousand varas on each side, which measurement shall be the unity for counting one, two or more labors. These labors can be divided into halves and quarters, but not less.

"Art. 8. To the colonists, whose occupation is farming, there cannot be given less than one labor, and to those whose occupation is stock raising, there cannot be given less than one sitio.

"Art. 9. The government of itself or by means of the authorities authorized for that purpose, can augment said portions of land as may be deemed proper, agreeably to the conditions and circumstances of the colonists.

"Art. 10. Establishments made under the former government which are now pending, shall be regulated by this law in all matters that may occur, but those that are finished shall remain in that state.

"Art. 11. As one of the principal objects of laws in free governments ought to be to approximate, so far as is possible, to an equal distribution of property, the government, taking

into consideration the provisions of this law, will adopt measures for dividing out the lands, which may have accumulated in large portions, in the hands of individuals or corporations, and which are not cultivated, indemnifying the proprietors for the just price of such lands to be fixed by appraisers."

"Art. 19. To each empresario, who introduces and establishes families in any of the provinces designated for colonization, there shall be granted at the rate of three haciendas and two labors, for each two hundred families so introduced by him, but he will lose the right of property over said lands should he not have populated and cultivated them in twelve years from the date of the concession. The premium cannot exceed nine haciendas and six labors, whatever may be the number of families he introduces.

"Art. 20. At the end of twenty years the proprietor of the lands, acquired in virtue of the foregoing article, must alienate two thirds part of said lands, either by sale, donation, or in any other manner he pleases. The law authorizes him to hold in full property and dominion one third part.

"Art. 21. The two foregoing articles are to be understood as governing the contracts made within six months, as after that time, counting from the day of the promulgation of this law, the executive can diminish the premium as it may deem proper, giving an account thereof to Congress, with such information as may be deemed necessary.

"Art. 22. The date of the concessions for lands constitutes an inviolable law for the right of property and legal ownership; should any one through error, or by subsequent concession, occupy land belonging to another, he shall have no right to it, further than a preference in case of sale, at the current price.

"Art. 23. If, after two years from the date of concession, the colonist should not have cultivated his land, the right of property shall be considered as renounced, in which case the respective ayuntamiento can grant it to another.

"Art. 24. During the first six years from the date of the concession the colonists shall not pay tithes, duties on their produce, nor any contribution under whatever name it may be called.

" Art. 25. The next six years from the same date they shall pay half tithes, and the half of the contributions, whether direct or indirect, that are paid by the other citizens of the empire. After this time they shall in all things relating to taxes and contributions, be placed on the same footing with the other citizens."

" Art. 29. Every person shall be free to leave the empire, and can alienate the lands over which he may have acquired the right of property, agreeably to the tenor of this law, and he can likewise take away from the country all his property, by paying the duties established by law."

There is a dispute as to the proper translation of section 4, the original of which is :

" Art. 4. Las familias que por si mismas vengan á establecerse, se presentarán immediatamente al respectivo Ayuntamiento del lugar en que quieran radicarse, para que conforme á las órdenes con que se hallen del Gobierno se les designe por aquel cuerpo el terreno que les corresponda segun la industria que van á plantear ; "

and a translation thereof, as furnished by Mr. Tipton, a special agent and Spanish expert of the Department of Justice in the office of the United States attorney for the Court of Private Land Claims, is :

" Art. 4. The families who come of themselves to settle shall present themselves immediately to the respective ayuntamiento of the place at which they desire to establish themselves in order that, in conformity with the orders which they have from the executive, there be designated to them by that body the lands to which they are entitled, according to the industry which they are going to undertake."

At the time of the enactment of this colonization law Iturbide was the Emperor of Mexico. Soon thereafter a revolution followed. He abdicated March 20, 1823, and his banishment was ordered by a decree of the Constituent Congress of Mexico, April 23, in these words :

" The Sovereign Constituent Congress of Mexico, in the session of yesterday, decreed the following :

" 1. That the coronation of Agustin de Iturbide being an

act of violence and of force, and void in law, there is no occasion to discuss the abdication he makes of the crown.

"2. Consequently, it also declares as void the hereditary succession and the titles that have emanated from the coronation; and that all the acts of the late government, from the 19th of May to the 29th of March last, are illegal, but subject to revision by the present Congress for their confirmation or revocation.

"3. The supreme executive authority will cause the prompt departure of Agustin de Iturbide from the territory of the nation."

Article 10 of the original draft of the treaty of Guadalupe Hidalgo, as agreed upon between the commissioners representing this Government and Mexico, was as follows:

"Art. 10. All grants of land made by the Mexican Government, or by the competent authorities in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid to the same extent that the same grants would be valid if the said territories had remained within the limits of Mexico. But the grantees of land in Texas, put in possession thereof, who, by reason of the circumstances of the country since the beginning of the troubles between Texas and the Mexican Government, may have been prevented from fulfilling all the conditions of their grants, shall be under the obligation to fulfil the said conditions within the periods limited within the same, respectively; such periods to be now counted from the date of the exchange of ratifications of this treaty; in default of which the said grants shall not be obligatory upon the State of Texas in virtue of the stipulations contained in this article. The foregoing stipulation in regard to grantees of land in Texas is extended to all grantees of land in the territories aforesaid elsewhere than in Texas, put in possession under such grants; and in default of the fulfilment of the conditions of any such grant within the new period, which, as above stipulated, begins with the day of the exchange of ratifications of this treaty, the same shall be null and void." (Message of the President of the United States, transmitting papers relative to the treaty

of Guadalupe Hidalgo, Feb. 8, 1849, Ex. Doc. 50, H. R. 30th Cong., 2d Sess. p. 17.)

That article, however, was stricken out by the Senate of the United States, and in the message of President Polk the reasons for its rejection are stated in the following language (Ib. 32):

"The objection to the tenth article of the original treaty was not that it protected legitimate titles, which our laws would have equally protected without it, but that it most unjustly attempted to resuscitate grants which had become mere nullities, by allowing the grantees the same period after the exchange of the ratifications of the treaty, to which they had been originally entitled after the date of their grants, for the purpose of performing the conditions on which they had been made. In submitting the treaty to the Senate I had recommended the rejection of this article. That portion of it in regard to lands in Texas did not receive a single vote in the Senate. This information was communicated by the letter of the Secretary of State to the Minister of Foreign Affairs of Mexico, and was in possession of the Mexican Government during the whole period the treaty was before the Mexican Congress, and the article itself was reprobated in that letter in the strongest terms. Besides, our commissioners to Mexico had been instructed 'that neither the President nor the Senate of the United States can ever consent to ratify any treaty containing the tenth article of the treaty of Guadalupe Hidalgo in favor of grantees of land in Texas or elsewhere.' And again, 'should the Mexican Government persist in retaining this article, then all prospect of immediate peace is ended, and of this you may give them an absolute assurance.'"

And in the treaty as ratified, 9 Stat. 922, were left the following provisions which guarantee only the rights of Mexicans to property belonging to them in the territory (9 Stat. 929, art. 8):

"Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove

at any time to the Mexican Republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax or charge whatever. . . . . In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States."

The act creating the Court of Private Land Claims, (Act of March 3, 1891, c. 539, 26 Stat. 854,) provides in section 13, 26 Stat. 860:

"First. No claim shall be allowed that shall not appear to be upon a title lawfully and regularly derived from the government of Spain or Mexico, or from any of the States of the republic of Mexico having lawful authority to make grants of land, and one that if not then complete and perfect at the date of the acquisition of the territory by the United States, the claimant would have had a lawful right to make perfect had the territory not been acquired by the United States, and that the United States are bound, upon the principles of public law or by the provisions of the treaty of cession, to respect and permit to become complete and perfect if the same was not at said date already complete and perfect."

The eighth subdivision of the same section also contains this limitation:

"No concession, grant or other authority to acquire land made upon any condition or requirement, either antecedent or subsequent, shall be admitted or confirmed unless it shall appear that every such condition or requirement was performed within the time and in the manner stated in any such concession, grant or other authority to acquire land."

*Mr. Robert Rae* and *Mr. J. B. Cessna* for appellants. *Mr. T. B. Catron* was on their brief.

*Mr. Solicitor General, Mr. Special Assistant Attorney General Reynolds* and *Mr. Frank Springer* for appellees submitted on their brief.

Mr. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The Court of Private Land Claims was of the opinion that the ayuntamiento or town council had no power to make a grant such as this of a tract entirely outside the four square leagues supposed to belong to the town; and, secondly, that even if it had such power the conditions of the alleged grant were never performed by Heath, and therefore he acquired no title to the property.

The colonization law of January 4, 1823, was in force only a short time, having been suspended by the decree of April 11, 1823, and superseded by the law of August 18, 1824. Few proceedings were had under it, and therefore its true meaning cannot be considered as determined by any settled usage of the Mexican authorities. Indeed, counsel for appellants, with all their industry, have been able to find but one other grant made or attempted to be made under its authority. It is, to say the least, difficult to discern in this law any warrant for an original grant by the ayuntamiento. Article 2 provides that "the executive will distribute lands." This is in accord with the settled policy of the old Spanish law, which reserved to the king the power of granting lands. Doubtless this power was often exercised under the directions of the king by subordinate officials, but full control was retained by him. So here the executive retains the control of the distribution of lands. It is true the article provides that such distribution shall be "under the conditions and terms herein expressed," but that simply means the conditions and terms under which the executive will act. Article 3 refers to grants to empresarios, and that specifically declares that they "shall previously contract with the executive," who will "designate the province to which they must direct themselves; the lands which they can occupy." It is said that Heath does not come

within the terms of this article because he did not propose to introduce at least two hundred families, and this contention is doubtless correct. Article 4, upon which the plaintiffs specially rely, makes provision for families who emigrate " not included in a contract," evidently referring thereby to the empresario contracts specified in the preceding section. Such families are directed to " present themselves to the ayuntamiento of the place where they wish to settle, in order that this body, in conformity with the instructions of the executive, may designate the lands corresponding to them, agreeably to the industry which they may establish." Accepting the contention of plaintiffs that Heath comes within the scope of this article, we note these limitations: The emigrating families are to present themselves to the ayuntamiento of the " place where they wish to settle," not the ayuntamiento of the town nearest to the land upon which they wish to settle. The natural meaning of this is that when families desire to settle within the limits of a town they shall present themselves to the ayuntamiento of that town for a designation of the lands they may occupy. It would be strange to find that a town council was empowered to grant lands outside the limits of the town and anywhere within the territory or department in which it was situated, while it is not strange to find that council authorized to locate emigrants upon those vacant lands not exceeding four leagues square which, according to Spanish and Mexican custom, were ordinarily appurtenant and subject to the jurisdiction of the town. We do not mean to intimate that El Paso in fact possessed a territory of four square leagues over which it had jurisdiction, although that seems to have been the opinion of the Court of Private Land Claims, for it said : " El Paso, like other Spanish towns, is presumed to have had a grant of four square leagues of land, and the ayuntamiento had the power to make allotments of land within the four leagues so granted."

This matter was considered in *United States* v. *Santa Fe*, 165 U. S. 675, 699, and the conclusion was reached after full examination that it was not true under the Spanish law that every town was entitled to a grant of four leagues square, the

court saying: "The inference to be deduced from all these documents supports the theory that under the Spanish laws, as found in the recopilacion, all towns were not entitled by operation of law to four square leagues, but that at a late date the Spanish officials had adopted the theory that four square leagues was the normal quantity which might be designated as the limits of the new pueblos to be thereafter created."

Still it was undoubtedly true that by special grant or contract many towns did have such an area of contiguous and dependent territory, and it would seem that this article gave the ayuntamiento authority to designate such portion of those lands as it deemed suitable to the industry which the emigrating families proposed to undertake.

We notice another limitation in this article, and that is that the designation by the ayuntamiento is to be made "in conformity with the instructions of the executive." This contemplates, as preliminary to the action of the ayuntamiento, some instructions from the executive, either general or special. Within the letter of this provision the executive might, in a given case, authorize the ayuntamiento of a particular town to designate lands outside of the town lands proper for emigrating families; but surely in this article there is no general grant of power to every town council to give away lands anywhere within the territory or department without any previous instructions or directions from the executive. Neither is the power contended for to be found in article 23, which simply authorizes the ayuntamiento, in case any colonist shall fail to cultivate the land which has been given him, to regrant the same tract to another. It might well be that the ayuntamiento should have power after the lapse of a grant to regrant the same tract to another party. But it does not follow therefrom that the power to regrant lapsed lands implies a power to make an original grant.

Neither is the plaintiffs' case helped by the assertion that the fact of a grant presumes the power to make it. Counsel quote from *United States* v. *Peralta*, 19 How. 343, 347: "The presumption arising from the grant itself makes it *prima facie*

evidence of the power of the officer making it, and throws the burden of proof on the party denying it."

Whatever may be the scope of this proposition, we find in these proceedings a distinct declaration that the town council regarded its action as only preliminary, and requiring for finality the approval of the government. In the first resolution passed by the ayuntamiento on the petition of Dr. Heath it is recited:

" 1. That, saving the superior determination of the government to which this shall be given, his proposals and petition are admitted, and when he presents himself, the land he asks. for shall be assigned to him in these terms : The head (toma) of the Bracito shall be the central point of the square of said ' hacienda ; ' that is to say, two and a half leagues in a straight line up the river, and two and a half leagues down the river, the same being observed in the sides that form the square."

And in the letter transmitting the proceedings to the governor it is said :

" The imitative circumstances of the new settlers and the fact that this corporation has no municipal ordinances regulating the distribution of land that may be useful and beneficial in promoting settlement, agriculture, arts, etc., place this corporation under the necessity of making known to your superiority the resolution, that your excellency may be pleased to dictate whatever may be your pleasure in the matter, whether it be by yourself or after consulting the most excellent provincial deputation."

And again —

" In order to avoid jealousies among private individuals and interests of some breeders of stock who generally are prejudicial to these in the development of agriculture, and arts, it is observed that this jurisdiction is just beginning, and at the same time gets poorer and poorer if it is not given or provided with industries and arts, and in order to have them in its territory a means therefor is that adopted by virtue of article 4, inasmuch as to reject it, difficulties would hereafter arise both because of the scarcity in the national exchequer and the poverty of these residents, for whom this ayunta-

miento, to which it very closely belongs to look out for their happiness, has without delay, put in operation the franchise of the law; this corporation stating, nevertheless, that if it has erred in anything, the concession has been made subject to the superior determination.

\*       \*       \*       \*       \*

"This ayuntamiento has found it convenient and worthy of public confidence to bring all of the foregoing before your excellency and the most excellent provincial deputation, that you may, in view thereof, order what may be just and convenient to remove uncertainties and to proceed with certainty in every matter, which is what is desired."

So that the ayuntamiento assuming to act declared specifically that it did so "subject to the superior determination," and submitted its action to the governor of the province.

Further, on the receipt of this communication by the acting governor, it was presented to the provincial deputation, which expressly disapproved the proposed grant, and directed that notice of its disapproval should be promptly communicated to Dr. Heath. The language of the resolution passed by the provincial deputation is clear. It declares that the action taken by the ayuntamiento was not only with prejudice to the inhabitants of that jurisdiction, but also in violation of law. It is true that it does not point out wherein the violation of law consists, and refrains from further observations on account of the repeal of the colonization law, but it does direct the ayuntamiento to give notice to Heath, through the United States minister, or in some other manner, that the possession given to him was "through a mistaken opinion and wrong understanding in relation to the colonization law already repealed," and that this notice should be given in order to prevent any claim for damages in case Dr. Heath should introduce into the province the families that he had offered to bring. Even if the disapproval had been based solely on the fact that the colonization law of 1823 had been repealed, that would have been sufficient, for whatever might be adjudged the power of the ayuntamiento, and although it might have made a grant without reference to the provincial depu-

tation or the governor of the province, yet, for reasons which to it were satisfactory, it expressly declared that the grant was subject to their approval, and in case that approval was withheld, of course the grant never became operative.

The other case to which counsel refer, in which the ayuntamiento assumed to act under the law of 1823, instead of supporting the contention that it had absolute power in the matter, tends in the other direction, and supports the opposite contention, for in that, as in this, it referred its action for approval to the governor of the province. That case was of a grant of a tract on the left side of the Rio Grande, made to Don José Lerma by this same ayuntamiento of El Paso, the proceedings in respect to which were introduced in evidence. They show that upon the petition of Lerma, on August 23, 1823, the ayuntamiento passed a resolution declaring that it deemed it proper to make the grant, but adding: " Let all that has been done be brought to the knowledge of the most excellent deputation of Chihuahua in order that it may approve this grant, if it be its superior pleasure."

In pursuance of this resolution the application was presented to the deputation of Chihuahua, which on October 10, 1823, approved the proposed grant in the following words :

" Agreeably to the resolution of the enlightened council of the town of El Paso, this most excellent deputation have deemed it proper to approve the grant of all the lands, woods and 'sierras' applied for by the resident Don José Lerma, it being of advantage to the nation to open fields and to form settlements resulting in public utility, that enlightened council being ordered to appoint a commission that shall proceed to survey these lands and to give possession to the party interested, in the name of the supreme powers of the nation, of the lands, 'sierras,' woods and pasturages applied for by him on the left side of the Rio Bravo del Norte."

On the receipt of such approval on October 30, 1823, the ayuntamiento proceeded to pass this resolution :

" Having received the foregoing application and approbation of the most excellent provincial deputation of Chihuahua to granting and putting the resident Don José Lerma in pos-

session of the unimproved lands, woods, pasturages and 'sierras' for which he made application for the purpose of settling on the line of the Rio Bravo del Norte and on the left side from opposite the 'Ojo del Toro,' or be it the 'Sierra de todos Santos,' to the 'Sierra Blanca,' the enlightened council of this town, in compliance with the order of said most excellent deputation, resolved to appoint a commission of respectable and honorable persons who shall proceed to survey and delineate those lands and to put said Don José Lerma in possession thereof."

It also appointed a commission to set off the tract to Lerma. On December 12, 1823, on the report of that commission, it entered the following order:

" The land grant applied for by the resident Don José Lerma being approved by the enlightened council and by the most excellent provincial deputation of the city of Chihuahua, as is evidenced by the foregoing proceedings carried on by the president of the appointed commission, who is also the president of this corporation, let this record be referred to its secretary for taxation of the per diem and writing therein, according to the tariff in force in this council, in order that the party interested may be informed of the fees he must pay."

Even this action did not seem to resolve all doubts as to the validity of this grant, for, in a petition presented by Lerma to the constitutional governor of the State of Chihuahua in 1828, he set forth the action of the ayuntamiento and the provincial deputation in 1823, and the delivery to him of the tract, and then, after alleging that the subsequent ayuntamiento refused to acknowledge the validity of the grant, added :

" In these terms he appeals to your excellency, praying that he be recognized in his rights of ownership of the lands which belonged to him, confirming him in his said property, which was granted to him in order that a settlement be formed in said lands, and that the council of the town of El Paso be notified accordingly. I pray for justice and make the necessary protestation at Paso del Norte, May 12, 1828."

Upon such petition the following action was taken:

" To the president of the council of the town of El Paso del Norte:

" The decree or title of possession ordered to be given by the provincial deputation and the council of El Paso del Norte in the year 1823, whereby fifty leagues of land on the left side of the Rio Bravo were granted to Don José Lerma, has been ratified and confirmed by the second constitutional congress of this State in consideration of distinguished military services rendered to the Republic by the retired lieutenant, José Lerma:

" Therefore, this government considers that the land transferred by the granted bounty is an exclusive property of the said Lerma, ratifying it in all its parts. The council of El Paso del Norte will act accordingly. God and liberty.

" Chihuahua, June 30, 1828."

This order of the governor, as will be seen, did not rest the validity of the grant upon the action of the ayuntamiento, or even upon its action as approved by the provincial deputation, but recited that the title had been ratified and confirmed by the second constitutional congress of the State. So that the only other case in which, as said by counsel, action was taken under this law of 1823 by any ayuntamiento clearly shows that it did not understand that it had absolute power, but that its proceedings required approval by the provincial deputation, or some higher authority. The Court of Private Land Claims was right in its conclusions that no final grant had ever been made to Doctor Heath of the tract in controversy.

But it is unnecessary to rest the case upon this alone, for even if the ayuntamiento had full and final jurisdiction in the premises and had made an absolute and unconditional grant — one beyond the power of any superior authority to disapprove and annul, still we think the judgment of the Court of Private Land Claims was right, because, as indisputably appears from the evidence, when Doctor Heath came with his colonists to take possession of the tract, the Mexican authorities repudiated the alleged grant, denied his rights and practically drove him from the country. Not only that, but, as the record shows, the Mexican government thereafter granted to other parties large portions of the same tract. The disavowal, repudiation, expulsion and subsequent grants were in no respect the irregular acts of a mere mob or other unauthorized parties. They

were the deliberate official proceedings of the duly constituted authorities of the Mexican government. This repudiation commenced in 1824 and continued until the cession of territory to the United States, under the treaty of Guadalupe Hidalgo. During all those years, so far as the record shows, no action was taken by Doctor Heath to enforce his claim or recover damages from the government of Mexico for the alleged wrongs done him. Neither were any proceedings taken by him, or those claiming under him, from the treaty of cession until the presentation of this petition before the Court of Private Land Claims. In other words, for seventy years (more than twenty of which the land was within the dominion of the government of Mexico) this claim was permitted to lie dormant. Other people have passed into possession of parts, at least, of the tract, and are occupying it under subsequent grants from that government. Twice during this lapse of time was provision made for an adjustment of claims of citizens of the United States against the government of Mexico. On April 11, 1839, a convention was entered into between the two nations referring to four commissioners all claims of citizens of the United States against Mexico which had been presented to this government for consideration. 8 Stat. 526. And again, in the treaty of Guadalupe Hidalgo, there was a further provision of like nature. 9 Stat. 922. Article 14 of that treaty released the Mexican government in these words:

"The United States do furthermore discharge the Mexican republic from all claims of citizens of the United States, not heretofore decided against the Mexican government, which may have arisen previously to the date of the signature of this treaty; which discharge shall be final and perpetual, whether the said claims be rejected or be allowed by the board of commissioners provided for in the following article, and whatever shall be the total amount of those allowed."

The fifteenth article, which created the commission, directed that it should be guided and governed by the principles and rules of decisions prescribed by the first and fifth articles of a prior unratified convention, and in the first of those articles it was provided —

"The said commissioners, thus appointed, shall, in the presence of each other, take an oath to examine and decide impartially the claims submitted to them, and which may lawfully be considered, according to the proofs which shall be presented, the principles of right and justice, the law of nations, and the treaties between the two republics."

So that if Doctor Heath had any claim against the Mexican government on account of being deprived of this alleged grant he could, by a presentation of it under one or the other of these treaties, have received full compensation. The fact that he made no claim is persuasive evidence that he did not understand that what had taken place amounted to a complete grant.

Further, when the United States received this territory under the treaty of Guadalupe Hidalgo they refused to recognize as still valid and enforceable all grants which had been assumed to be made prior thereto by the Mexican authorities. Article 10 as proposed by the commissioners was rejected by this government and stricken out from the treaty. That article not only contemplated binding this government to respect all grants which would have been recognized as valid by the government of Mexico if no cession had been made, but also proposed to give to grantees who had failed to perform the conditions of their grants, and whose failure to perform might be deemed to have avoided the grants, further time to perform the conditions. By the rejection of this article this government distinctly declared that it did not propose to recognize any grants which were not at the time of the treaty of cession recognized by the Mexican government as valid or any whose conditions, either precedent or subsequent, had not been fully performed.

In this respect the action taken was in harmony with the general rule of international law. It is the duty of a nation receiving a cession of territory to respect all rights of property as those rights were recognized by the nation making the cession, but it is no part of its duty to right the wrongs which the grantor nation may have theretofore committed upon every individual. There may be an exception when the dis-

possession and wrong of the grantor nation were so recently before the cession that the individual may not have had time to appeal to the courts or authorities of that nation for redress. In such a case perhaps the duty will rest upon the grantee nation, but such possible exception has no application to the present case and in no manner abridges the general rule that among the burdens assumed by the nation receiving the cession is not the obligation to right wrongs which have for many years theretofore been persisted in by the grantor nation. Because Mexico had more than twenty years before the cession forcibly taken from Doctor Heath land that was rightfully his and given part or all of it to other persons it does not follow that when the United States accepted the cession they came under obligations to do that which Mexico had failed to do, place Doctor Heath in possession and restore to him the land of which he had been thus wrongfully deprived. Such action if taken might well expose this government to just claims for compensation in behalf of the subsequent grantees of Mexico, who apparently took no personal part in the wrongs done to Heath. Doctor Heath may have had a claim against Mexico for those wrongs, but he failed to prosecute his claim in the way prescribed, and he cannot now make his failure to pursue such prescribed way a reason for enforcing a title which that nation had refused to recognize. So long as Mexico repudiated his claim to this tract his only recourse was by direct appeal or through the intervention of this government to seek compensation for the property of which he had been deprived. When this government accepted the cession of the territory it did not thereby assume an obligation to satisfy any pecuniary demands which he as an individual may have had against the Mexican government. In other words, it took that territory bound to respect all rights of property which the Mexican government respected, but under no obligations to right the wrongs which that government had theretofore committed.

But even if there were an obligation on the part of this government, either under the general rules of international law or the terms of the treaty of cession, to recognize plain-

tiffs' claim to this particular tract, yet the time, manner and conditions of enforcing it would depend upon the will of Congress. And in creating the Court of Private Land Claims Congress has prescribed the character of claims which that court may determine and the conditions which must attach to any claim which it may enforce. This claim, even if the grant in its inception was valid, was not one which it was within the province of the Court of Private Land Claims to approve and confirm. The eighth clause of section 13 forbids the confirmation of a grant made upon any condition or requirement, either antecedent or subsequent, unless it appears that such condition and requirement had been performed within the time and in the manner stated in the grant. That certain conditions or requirements were attached to this grant is evident from a perusal of the application and the order. That they were not performed is admitted by plaintiffs. Their contention is that performance was prevented by the Mexican authorities, and having been prevented it should be considered that performance was waived and the title had become absolute. Whatever may be said as to the duty of this government to treat a condition whose performance was prevented by the Mexican authorities as a condition performed does not detract from the proposition that the Court of Private Land Claims is not vested with such power. It is a mere creature of statute with prescribed and limited powers. It has no general equity jurisdiction. It can confirm a grant made upon condition only when such condition was performed. It is not under the statute at liberty to treat anything as equivalent to performance. Cases in which there was no performance of the conditions of the grant are cases which must be considered as reserved by Congress for further action on its part. So that under the terms of the act creating the Court of Private Land Claims, even if there were no other objections to the proceedings, the admitted fact that the conditions and requirements of this grant were never performed is sufficient to justify the ruling of the court in dismissing the petition.

Of course, the observations above made may not be appli-

cable to a case in which the Mexican government had subsé-
quently to the original grant and prior to the cession waived
the performance of the conditions. For as it had power in
the first instance to make the grant without conditions, its
action in subsequently waiving or removing such conditions.
was equivalent to an original grant without conditions.

We have not deemed it necessary to consider the matter of
limitations and laches. That this is an old claim is evident,
seventy years having elapsed between its inception and its
prosecution. Whether it must also be adjudged a stale claim
and beyond judicial recognition need not be determined. The
other reasons presented for its rejection are sufficient.

We see no error in the proceedings, and the judgment is

*Affirmed.*