Peelle, Ch. J.,
delivered the opinion of the court:
The question here arises on the defendants’ motion to dismiss the petition on the ground “ that it does not disclose a *648 cause of action within the jurisdiction of the court.” . That is to say, the defendants contend that the claim grows out of treaty stipulations with a foreign nation (the treaty of Paris), and for that reason the court, under Bevised Statutes, section 1066, is inhibited from taking jurisdiction.
By the averments of the petition it appears that in 1879 .and subsequent years prior to the War with Spain the claimant company, a British corporation, procured from the Spanish Government three separate grants and concessions for the establishment of submarine telegraph cables communicating between the islands of Luzon, Panay, Negros, and Zebu, in the Philippine Archipelago, and Hongkong, China, the cables so constructed to be worked by the claimant company at its own expense for a period of 20 years for an annual subsidy of £4,500, payable monthly at Manila by the chief treasury office of those islands.
Prior to December, 1898, the Philippine Archipelago, including the islands named, was under the control and sovereignty of the Government of Spain, but by Article III of the treaty of Paris of that date (30 Stat. L., 1754), ceding the Philippine Archipelago to the United States, the control and sovereignty of Spain passed to the control and sovereignty of the United States, who as averred thereupon took possession of said islands and cable lines so constructed, and have ever since used the same without making any compensation therefor. The averment in the petition is that no payment has been made for the use of said cables for the years 1905, 1906, 1907, 1908, and 1909. Under what circumstances the cables were used prior thereto and whether if used any payment was made therefor does not appear; and as no claim is made for use thereof prior to 1905, the court, for the purposes of this case, concludes that the use began in 1905.
By Article VIII of the treaty all buildings, wharves, public highways, forts, and all public property which by law belong to the public domain, and as such to the Crown of Spain, were ceded or relinquished to the United States, lor which it is understood $20,000,000 were paid. It is therein expressly provided that the relinquishment or cession “ can *649 not in any respect impair the property or rights which by law belong, to the peaceful possession of property of all kind of Provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be.” This is the usual stipulation in treaties and is in effect a declaration of the rights of the inhabitants under international law. {United States v. de la Arredondo, 6 Pet., 691, 712.)
The claimant’s contention is (1) that section 1066 of the Revised Statutes was superseded and repealed by section 1 of the act of March 3, 1887 (24 Stat. L., 505); (2) that the claim herein is not one “ growing out of or dependent on any treaty stipulation .entered into with” the Government of Spain; and (3) that by the law of nations the United States became obligated to perform the contract of its predecessor in said islands.
Sections 7 and 9 of the act of March 3, 1863 ,(12 Stat. L., 765, 767), carried into Revised Statutes as sections 1059 and 1066, read:
“Sec. 1059. The Court of Claims shall have jurisdiction to hear and determine the following matters: First. All claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, expressed or implied, with the Government of the United States, and all claims which may be referred to it by either House of Congress.”
$ $ & $ $
“ Sec. 1066. The jurisdiction of the said court shall not extend to any claim against the Government not pending therein on December one, eighteen hundred and sixty-two, growing out of or dependent on any treaty stipulation entered into with foreign nations or with the Indian tribes.”
Under these sections of the statute the court in the case of Great Western Insurance Co. v. United States (112 U. S., 193), affirming this court (19 C. Cls., 206), held that the jurisdiction of the court did not extend to claims growing out of or dependent on treaty stipulations with foreign na *650 tions, and that as the claim then under consideration was for part- of the money received from Great Britain in payment of the award made at Geneva under the treaty of Washington the court had no jurisdiction. To the same effect also is the case of Alling and another v. United, States (114 U. S., 562).
Thereafter the jurisdiction of the court was enlarged by section 1 of the act of March 3, 1887 (24 Stat. L., 505), Avhich, so far as important here, reads: “ That the Court of Claims shall have jurisdiction to hear and determine the following matters: First. All claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an executive department, or upon any contract, expressed or implied, with the Government of the United States, or for damages, liquidated or un-liquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable.”
i\i * * * i'fi
The repealing section to that act is as follows:
“Sec. 16. That all laws and parts of laws inconsistent with this act are hereby printed.”
Since the passage of the latter act doubt has been suggested both by the Supreme Court and this court whether said act did-notrepeal section 1066. (United States v. Weld, 127 U. S., 51, affirming this court, 23 C. Cls., 129, and Juragua Iron Co. v. United States, 212 U. S., 297, 310, affirming this court, 42 C. Cls., 99.) But by the recent act “ to codify, revise, and amend the laws relating to the judiciary,” approved March 3, 1911, section 1066 as well as the act of March 3, 1887— omitting the repealing section in the latter act — were both reenacted, to take effect January 1,1912.
That it was the purpose of Congress by the reenactment of section 1066 and the omission of the repealing section in the act of 1887- — when the act takes effect — to exclude claims growing out of or dependent on treaty stipulations with foreign nations from the jurisdiction of the court, might, perhaps, be considered as removing the doubts theretofore existing; but it is not necessary to now pass upon this *651 question, for as we view it the claim herein is not one growing out of or dependent on any stipulation in the treaty of Paris. True, but for the cession of the territory the claimant would have no standing ag;ainst the United States. But, as was said by the court in the case of United States v. Weld (127 U. S., 51, 57), “In our view of the case, the statute contemplates a direct and proximate connection between the treaty and the claim, in order to bring such claim within the class excluded from the jurisdiction of the Court of Claims by section 1066, Revised Statutes. In order to make the claim one arising out of the treaty within the meaning of section 1066, Revised Statutes, the right itself, which the petition makes to be the foundation of the claim, must have its origin — derive its life and existence — from some treaty stipulation.”
As there is no stipulation for the assumption by the United States of the claim herein or of the colonial obligations or debts of the Spanish Government upon which the right itself can be based, it can not be held that the claim herein had its origin under or derives its life and existence from any stipulation in the treaty, though protected from impairment by Article VIII. Indeed, the claim herein accrued from the use of the cables by the United States long subsequent to the cession of the territory. So, if any obligation arises to pay the claim, it must be outside and therefore independent of the treaty.
Force is given to this view by the action of the commissioners negotiating the treaty even as to debts existing against Spain at the time of the cession. On behalf of the Spanish Government the commissioners endeavored to have incorporated in the treaty articles to the effect that the colonial grants and contracts for public works and services in the ceded territory should thereafter be maintained, and that the United States should assume all the rights and obligations of the Government of Spain. But the commissioners on behalf of the United States rejected the articles so proposed, stating “ that they would not accept any articles that required the United States to assume the so-called colonial debts of Spain.” They further stated that they disclaimed “ any purpose of their Government to disregard the obliga *652 tions of international law in respect to such, contracts as investigation may show to be valid and binding upon the United States as successor in sovereignty in the ceded territory.” (S. Doc. 62, 55th Congf., 3d sess., pp. 240, 241.)
From this it may fairly be said that the claim does not arise out of or depend on the treaty, although but for the treaty no such claim could have arisen.
What, then, if any, are the obligations resting upon the Government under international law of which the court can take jurisdiction?
In the absence of any provision in a treaty to the contrary the municipal laws of the territory in force at the time of the cession continue until changed by the new Government. (Chicago, etc., R. R. Co., v. McGlinn, 114 U. S., 542.) This, too, notwithstanding the territory so ceded is held subject to the constitution and laws of the new Government. (Pollard v. Hagan, 3 How., 212; Benson v. United, States, 146 U. S., 325, 330; Strother v. Lucas, 12 Pet., 410; United States v. Power, 11 How., 570.) Upon the acquisition of territory the private relations and rights of property are not disturbed by a change of allegiance. (United States v. Percheman, 7 Pet., 51, cited in numerous cases, including that of Downes v. Bidwell, 182 U. S., 244, 361. See also Interstate Land Co. v. Maxwell Land Grant Co., 139 U. S., 569.) In other words, the cession of territory does not carry with it the property of the inhabitants thereof. (Strother v. Lucas, supra.) On the other hand, upon such cession it has been held that the new Government succeeds ho the position of the former Government respecting the property rights of the inhabitants in lands, whether executed or executory. (Soulard v. United States, 4 Pet., 511.) It has also been held that by the law of nations the inhabitants, citizens, or subjects of acquired or ceded territory retain all their rights of property not taken from them by orders of the conqueror or by the laws of the sovereign acquiring the same. (Mitchell v. United States, 9 Pet., 711.) Nor is title derived by grant to be effected by the political authorities of the new sovereign otherwise than other property of the inhabitants. (Doe Ex Dem. Barbarie v. Eslava, 9 How., 421, cited in Cofee v. Groover, 123 U. S., 10.)
*653 In the case of Cessna v. United States (169 U. S., 165, 186) the court observed: “ It is tlie duty of a nation receiving a cession of territory to respect all rights of property as those rights were recognized by the nation making the cession, but it is no part of its duty to right the wrongs which the grantor may have theretofore committed.”
This, however, in the absence of a stipulation in the treaty therefor, does not mean that the United States assumed the personal obligations or debts of the Spanish Government to individuals or corporations unless under the rules of international law they thereby became liable. When the United States succeeded to the sovereignty of Spain over the islands they were under no more obligation to' continue the contracts for public or private service of individuals or corporations than they were to continue in office officials appointed by the Spanish Government. (Sanchez v. United States, 42 C. Cls., 458; affirmed, 216 U. S., 167.)
Respecting property in lands a different rule may well be applied, for, as said by Chief Justice Marshall in the case of Soulard v. United States, supra, “ The term 4 property,’ as applied to lands, comprehends every species of title inchoate or complete. It is supposed to embrace those rights which lie in contract, those which are executory as well as those which are executed. In this respect the relation of the inhabitants to their Government is not changed. The new Government takes the place of that which has passed away.”
When the United States took possession of the ceded territory they were under no obligation to use the claimant’s cables either in execution of its contract with Spain or otherwise; and therefore if used they were under no obligation to make compensation therefor upon the basis of said contract. So if any obligation arises to pay for the use thereof it must arise under an implied contract for reasonable compensation.
The cables so constructed under the grants or contracts aforesaid were not public property belonging to the Crown of Spain, and therefore did not pass to the United States by the treaty, but were the private property of the claimant; and if so. then is not the claimant entitled to reasonable com *654 pensation for the use thereof as upon an implied contract arising under municipal or international law? And as was said by the court in the case of The Paquete Habana (175 U. S., 677), “ International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination.” So, whether such implied contract arose under the one or the other is immaterial for the purpose of this case. When, the United States took possession of the cables and used them without claim of ownership — the contrary not appearing — an implied contract thereby arose to pay for such use the same as though they had taken possession of a railroad upon which to transport troops or a building in which to store supplies — not, however, as before stated, upon the basis of the contract between the claimant and the Spanish Government, but reasonable compensation.
In the case of the Philippine Sugar Estates Development Co. (39 C. Cls., 225; 40 C. Cls., 33), where real estate was taken possession of by the Army without claim of right subsequent to the treaty, it was held that under executive instructions directing payment for private property taken for the use of the Army an implied contract arose upon which an action could be maintained in this court, on the theory that where the Government takes possession of real estate without claiming to own it a promise of compensation will be implied. It was further held that when the country which had been the scene of war had been reduced to subjection the general rule respecting the appropriation of property and payment therefor prevails.
From what we have said it follows that the defendants’ motion to dismiss must be, and the same is hereby, overruled.