Peelle, Ch. J.,
delivered the opinion of the court:
The defendants’ motion to dismiss the petition in this case was heretofore overruled (46 C. Cls., 646) on the ground that while the United States were not liable under their treaty with Spain for the annual subsidy agreed to be paid by the Government of Spain for the construction of the cables, as set forth in the petition, they were liable on an implied contract to make reasonable compensation for the use of the cables.
Since this ruling the Government has interposed a demurrer to the petition on the ground: “ First. It does not set forth facts sufficient to constitute a cause of action against the United States. Second. It does not disclose a cause of action within the jurisdiction of this court.”
The contentions of the parties on the demurrer are substantially, if not identically, the same as when the question was up on the motion to dismiss, and therefore we will briefly review what was said in the opinion on the motion to dismiss.
The petition avers substantially that prior to the War with Spain the claimant herein, a British corporation, had by separate grants and concessions entered into contracts with the Spanish Government for the construction and operation at its own expense of certain submarine cables and telegraph land lines communicating between the Island of Luzon and certain other islands in the Philippine Archipelago and Hongkong, China, for which the Spanish Government agreed to pay the claimant an annual subsidy of £4,500, payable monthly at Manila by the chief treasury office of those islands.
*43 That prior to December, 1898, the Philippine Archipelago, including the islands referred to, was under the control and sovereignty of the Government of Spain, but by Article III of the treaty of Paris of that date (30 Staf. L., 1154), ceding the Philippine Archipelago to the United States, the control and sovereignty of Spain passed to the control and sovereignty of the United States, who thereupon took possession of said islands and, as averred, assumed “jurisdiction and control over all property and property rights in and upon said Philippine Islands, including the several lines of submarine cable and telegraph land lines established, constructed, and operated by the claimant, and availed itself of all the benefits and advantages thereof, using said lines of cable and telegraph for its governmental and other purposes, which it has continued to do ever since and still continues to do ” without the payment of said annual subsidy of £4,500 so theretofore agreed to be paid by the Spanish Government.
By Article VIII of the treaty all buildings, wharves, public highways, forts, and all public property which by law belong to the public domain, and as such to the Crown of Spain, were ceded or relinquished to the United States, for which it is understood $20,000,000 were paid; and it was therein provided that the relinquishment or cession “ can not in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds, of Provinces, municipalities, public or private, establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be.”
Upon investigation it will be found that the foregoing is the usual stipulation in treaties and is in effect a declaration of the rights of the inhabitants under international law. [United States v. de la Arredondo, 6 Pet., 691, 712.)
When this case was considered on the motion to dismiss the claimant’s contention was (1) that section 1068 of the Devised Statutes — excluding from the court’s jurisdiction claims growing out of or dependent on treaty stipulations with foreign nations — was superseded and repealed by section 1 of *44 the act of March 3, 1887 (24 Stat. L., 505) ; (2) that the claim herein was not one “ growing out of or dependent on any treaty stipulation entered into with ” the Government of Spain; and (3) that by the law of nations the United States became obligated to perform the contract of its predecessor in said islands.
In the absence of any provision in a treaty to the contrary the municipal laws of the territory in force at the time of the cession continue until changed by the new Government. (Chicago, etc., R. R. Co. v. McGlinn, 114 U. S., 542.) This, too, notwithstanding the territory so ceded is held subject to the constitution and laws of the new Government. (Pollard v. Hagan, 3 How., 212; Benson v. United States, 146 U. S., 325, 330; Strother v. Lucas, 12 Pet., 410; United States v. Power, 11 How., 570). Upon the acquisition of territory the private relations and rights of property are not disturbed by a change of allegiance. (United States v. Percheman, 7 Pet., 51, cited in numerous cases, including that of Downes v. Bidwell, 182 U. S., 244, 367. See also Interstate Land Co. v. Maxwell Land Grant Co., 139 U. S., 569.) In other words, the cession of territory does not carry with it the jiroperty of the inhabitants thereof. (Strother v. Lucas, supra.) On the other hand, upon such cession it has been held that the new Government succeeds to the position of the former Government respecting the property rights of the inhabitants in lands whether executed or executory. (Soulard v. United States, 4 Pet., 511.) It has also been held that by the law of nations the inhabitants, citizens, or subjects of acquired or ceded territory retain all their rights of property not taken from them by orders of the conqueror or by the laws of the sovereign acquiring the same. (Mitchell v. United States, 9 Pet., 711.) Nor is title derived by grant to be affected by the political authorities of the new sovereign otherwise than other property of the inhabitants. (Doe Ex Dem. Barbarie v. Eslava, 9 How., 421, cited in Cofee v. Groover, 123 U. S., 10.)
In the case of Cessna v. United States (169 U. S., 165, 186) the court observed: “ It is the duty of a nation receiving"'a cession of territory to respect all rights of property *45 as those rights were recognized by the nation making the cession, but it is no part of its duty to fight the wrongs which the grantor may have theretofore committed.”
This, however, in the absence of a stipulation in the treaty therefor, does not mean that the United States assumed the-personal obligations or debts of the Spanish Government to individuals or corporations unless under the rules of international law they thereby became liable. When the United States succeeded to the sovereignty of Spain over the islands they were under no more obligation to continue the contracts for public or private service of individuals or corporations than they were to continue in office officials appointed by the Spanish Government. (Sanchez v. United States, 42 C. Cls., 458; affirmed 216 U. S., 167.)
The cables so constructed under the grants or contracts aforesaid were not public property belonging to the Crown of Spain, and therefore did not pass to the United States by the treaty, but were the private property of the claimant, and, so far as the averments of the petition show, were so recognized by the United States.
In construing the act of our jurisdiction as it then existed, Revised Statutes, section 1059, the court in the case of Great Western Insurance Co. v. United States (112 U. S., 193), affirming this court (19 C. Cls., 206), held that the jurisdiction of the court did not extend to claims growing out of or dependent on treaty stipulations with foreign nations, and that as the claim then under consideration was for part of the money received from Great Britain in payment of the award made at Geneva under the treaty of Washington, the court had no jurisdiction. To the same effect also is the case of Alling and another v. United States (114 U. S., 562).
Thereafter the jurisdiction of the court was enlarged by section 1 of the act of March 3, 1887 (24 Stat. L., 505), and by section 16 thereof all laws and parts of laws inconsistent therewith were repealed.
Since the passage of the latter act doubt has been suggested both by the Supreme Court and this court whether said act did not repeal section 1066. (United States v. Weld, 127 U. S., 51; affirming this court, 23 C. Cls., 129, and *46 Juragua Irdn Go. v. United States, 212 U. S., 297, 310, affirming this court, 42 C. Cls., 99.) But by the recent act “ to codify, revise, and amend the laws relating to the judiciary,” approved March 3, 1911, section 1066, as well as the act of March 3, 1887 — omitting the repealing section in the latter act — were both reenacted, to take effect January 1, 1912, long subsequent, however, to the treaty of Paris.
That it was the purpose of Congress by the reenactment of section 1066 and the omission of the repealing section in the act of 1887 — when the act took effect — to exclude claims growing out of or dependent on treaty stipulations with foreign, nations from the jurisdiction of the court, might, perhaps, be considered as removing the doubts theretofore existing; but it is not necessary to now pass upon this question, for, as we view it, the claim herein is not one growing out of or dependent on any stipulation in the treaty of Paris. As was said by the court in the case of United States v. Weld (127 U. S., 51, 57), “ In our view of the case, the statute contemplates a direct and proximate connection between the treaty and the claim, in order to bring such claim within the class excluded from the jurisdiction of the Court of Claims’ by section 1066, Revised Statutes. In order to make the claim one arising out of the treaty within the meaning of section 1066, Revised Statutes, the right itself, which the petition makes to be the foundation of the claim, must have its origin — derive its life and existence — from some treaty stipulation.”
As there is no stipulation for the assumption by the United States of the claim herein or of the colonial obligations or debts of the Spanish Government upon which the right itself can be based, it can not be held that the claim herein had its origin under or derives its life and existence from any stipulation in the treaty, though protected, if existing, from impairment by Article VIII. So, if any obligation arises to pay the claim it must be outside and therefore independent of the treaty. Force is given to this view by the action of the commissioners negotiating the treaty even as to debts existing against Spain at the time of the cession. On behalf of the Spanish Government the commissioners endeavored to have *47 incorporated in the treaty articles to the effect that the colonial grants and contracts for public works and services in the ceded territory should thereafter be maintained, and that the United States should assume all the rights and obligations of the Government of Spain. But the commissioners on behalf of the United States rejected the articles so proposed, stating “ that they would not accept any articles that required the United States to assume the so-called colonial debts of Spain.” They further stated that they disclaimed “ any purpose of their Government to disregard the obligations of international law in respect to such contracts as investigation may show to be valid and binding upon the United States as successor in sovereignty in the ceded territory.” (S. Doc. 62, 55th Cong., 8d sess., pp. 240, 241.) From this it may fairly be said that the claim does not arise out of or depend on the treaty, although but for the treaty no such claim could have arisen.
The claimant also contends that the use of the cables for governmental and other purposes operated as an election ratifying the benefits arising under the contract with the Spanish Government, and that therefore the United States should pay not only the reasonable rates for the transmission of messages, but in addition thereto the annual subsidy so agreed to be paid by the Spanish Government. In other words, the contention is that by the use of the cables for governmental and other purposes the Government in effect ratified the contract so entered into by the claimant with the Spanish Government.
It is not averred in the petition that the rates paid by the Government for messages transmitted over the cables for governmental and other purposes were under and pursuant to the terms of the concession to the claimant by the Spanish Government; but if we were to assume that such, was the inference from the averments, that would not, in the absence of legislative authority therefor, bind the Government to pay the annual subsidy.
When the United States took possession of the ceded territory they were under no obligation to use the claimant’s cables, either in execution of its contract with Spain or *48 otherwise. If it did so, an implied obligation arose to make reasonable compensation for such use. But for this use— the transmission of messages — we now understand compensation has been made, so the only claim is for the annual subsidy under the terms of the concession from or contract with Spain.
The general jurisdiction of this court arises under section 1 of the act of March 3, 1887, supra, giving the court “ jurisdiction to hear and determine, so far as material here, the following matters:
“First. All claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an executive department, or upon any contract, expressed or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable; * * * .”
In considering the classes of cases involved under that section the Supreme Court, in the case of Dooley v. United States (182 U. S., 222, 224), said: “ The first section evidently contemplates four distinct classes of cases: (1) Those founded upon the Constitution or any law of Congress, with an exception of pension cases; (2) cases founded upon a regulation of an executive department; (3) cases of contract, express or implied, with the Government; (4) actions for damages, liquidated or unliquidated, in cases not sounding in tort. The words 1 not sounding in tort5 are in terms referable to the fourth class of cases.”
It will be observed that the claim herein does not arise under the Constitution, or any law of Congress, or any regulation of an executive department, or upon any contract, express or implied, with the United States.
It is not averred that the Government seized or took physical possession of the cables or that, as sovereign over the islands, it did other than assume jurisdiction and control over all property and property rights therein, including the submarine cable and telegraph lines of the claimant, using the latter for its governmental and other purposes, for which it made compensation.
*49 There is no averment that the rights of the claimant in and to the ownership and control of its cable and telegraph lines were in any way interrupted or interfered with by the officers of the Government other than for the transmission of messages, for which compensation was made; and if they were, such acts would constitute a tort, over which this court would have no jurisdiction.
Claims for damages, liquidated or unliquidated — not sounding in tort — of which this court would have jurisdiction, usually, if not always, .arise out of a breach of some contractual relation with the Government. The breach of an express contract, in the absence of a specific stipulation, gives rise to an action for unliquidated damages; and so an action for unliquidated damages arises out of an implied contract, as where by authority of Congress private property is taken for public use.
If we should distinguish between an implied and a quasi •contract, the acts of the parties have not been such as to create the legal relation of ohligatio quasi ex contractu.
The obligation of Spain to the claimant was not the obligation of the Philippine Archipelago, though the Spanish Government saw fit to pay the subsidy out of the revenues of the islands; but if we were to assume that it was, the United States, in the absence of treaty stipulation, such as is referred to in Hall’s International Law, sec. 28, p. 104, would not be liable therefor. If we were to assume that the obligations of Spain to the claimant was a general debt of the Spanish Government, it would be a personal one, as laid down in Hall's International Law, p. 99, note; and being a personal obligation would not, in the absence of a treaty stipulation therefor, attach to the United States.
We reach the conclusion, then, that the claim herein is not embraced in either class under the act of 1887; and therefore if it arises at all it must be under international law.
We have examined with some care the able brief of counsel for the claimant along this line, but we are unable to agree with him that the authorities cited are controlling, especially on the question of the court’s jurisdiction; for if we were to assume that the claim is one arising under interna-
4 *50 tional law, the question whether the Court of Claims is the appropriate jurisdiction to determine the matter would still be open. True, the court in the case of The Paquete Habana (175 U. S., 677, 700) said: “International law is part of our law and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations.” * * *
The court must first acquire jurisdiction before it can ascertain the rights of the parties under international law and administer thereon. As the former is lacking in the present case, the court is without jurisdiction to determine the question, and therefore the demurrer must be sustained, which is accordingly done, and the petition dismissed.
Howry, J., was not present when this case was tried and took no part in the decision.