Howey, J.,
delivered the opinion of the court:
Following the motion of the defendants to set aside the judgment heretofore rendered in this cause (39 C. Cls.R.,225), and to amend the findings of fact upon the ground of newly *34 discovered evidence, the parties have filed an agreement that the judgment be opened for three purposes: (1) To determine the resultant liability of the Government arising out of use and occupation of the property described in the complaint as a military necessity; (2) in any event to deduct rent for certain of the premises not used at the time set forth in one of the findings, but occupied later; (3) and to add rentals to September, 1903, at the rates to be allowed by the court — a supplemental petition having been filed to include all rents — if liability be found to exist at all.
The motion is not founded upon error of law under the rule. Nevertheless, the denial of liability is renewed in such form as to present alleged error of law, and both plaintiff and the defendants unite in the request to have more fully considered the question which underlies every other in the case.
The alleged error of law grows out of the contention of the defendants that the premises were occupied in time of war as a military necessity incident especially to active operations, which, according to the contention, excludes the implied contract sufficiently to warrant the payment of rent. Plaintiff, on the other hand, contends that instead of rental beginning on an implied contract arising when military necessity ceased, it was military necessity of one sort or another which justified the original occupation and created the tenancy of the United States.under regulations promulgated by the President.
Executive instructions preceding the seizure and occupation directed that private property taken in territory (which included the Philippine Islands) for the use of the Army should be paid for when possible in cash, at a fair valuation, and when payment in cash was not possible receipts were to be given. (Richardson’s Presidents’ Messages, 208, 211.) The object in view in directing the execution of receipts necessarily meant the preservation of evidence for future payment in all cases where private property was taken for the use of the Army. These instructions preceded the taking in this case. But neither instruction was followed, for reasons which do not appear. This, however, is immaterial. The premises had been abandoned by the insurrec- *35 tionary forces, and the authorities of the United States took possession of the houses and grounds. The houses were used for officers’ quarters and barracks, for hospitals, and the storing of provisions. The tramway was also used for purposes incident to the care of the troops. The character of the use was the same throughout.
Without repeating more fully the general rules set forth in the original opinion of the court respecting the appropriation of private property and the obligation of the Government to pay for the same, it is now enough to say that the promise of compensation would be implied had the Government, not claiming to own the property, appropriated the same to its permanent use under the right of eminent domain. The appropriation for temporary use raised the implied contract to pay the value for the transient occupation and use upon the same principle as in the other case. That part of the country had been reduced to subjection, and the general rule respecting the appropriation of property and payment for it obtained as much in the distant archipelago as elsewhere. The property seized was not claimed by the United States, and the territory had become subject to the sole authority of the General Government. All private property there was subject to the necessities of the Government, and the principle usually obtaining in such cases became applicable, inasmuch as the defendants made no claim to the title. (United States v. Lynah, 188 U. S., 445.)
The President’s order was supported by the constitutional obligation of the Government to pay because of the circumstances under which the property was taken and its appropriation to the public use. (Fifth amendment to the Constitution.) The order was also in line with that construction which created the obligation on the part of the Government to reimburse the proper owners for property taken and used in emergent circumstances. (United States v. Russell, 13 Wall., 628.) The emergency gave the right to take, and the emergency has been shown to exist which justified the taking. (Mitchell v. Harmony, 13 How., 133, 134.)
The auditor’s report shows the value of the Mexican silver dollar in use in the Philippine Islands to have been during *36 the time the premises were occupied and used 43-J- cents in the currency of the United States. This valuation is based upon that estimate fixed by the court in the first consideration of the case. We see no reason to scale the estimate of value between the two currencies. The estimate of the army board does not materially differ from the estimate of the court. Accordingly, the findings are amended so as to exclude use and occupation of certain property (in conformity with the agreement of the parties) within certain dates and rentals are added under the supplemental petition to cover the demand set forth in the final pleadings.
Judgment will be entered for' plaintiff in the sum of $40,584.19.
Weldon, J., did not sit in this case and took no part in its decision.