THE ROMAN CATHOLIC APOSTOLIC CHURCH IN PORTO RICO *v.*
THE PEOPLE.

Original Jurisdiction.

No. 1.—Decided December 15, 1906.

CONCORDATS BETWEEN THE GOVERNMENT OF SPAIN AND THE HOLY SEE—SECU-
LARIZATION—PROPERTY OF THE CATHOLIC CHURCH.—By virtue of the stipula-

tions contained in the concordat completed by the Holy See and the Government of Spain on March 16, 1851, and in the additional agreement thereto of August 25, 1859, the Roman Catholic Apostolic Church has a right of ownership to the properties seized from the religious communities by virtue of the secularization laws, and which properties were in the possession of the Government up to the completion of the concordat and remained in the possession of the Government subsequently to the additional agreement entered into for the exchange in the manner stipulated therein.

FORCE OF CONCORDATS IN THE ISLANDS OF ULTRAMAR—ROYAL DECREE OF NOVEMBER 22, 1852.—By virtue of the provisions of the Royal Decree of November 22, 1852, which, although promulgated for the Island of Cuba, is perfectly applicable by analogy to the present litigation, and especially by virtue of the fifth provision of said decree the provisions of the concordats are applicable to the provinces of *ultramar* with respect to the acknowledgment of the exclusive ownership by the Catholic Church of the properties occupied by the regular clergy and the exchange thereof in the manner stipulated with the Holy See.

ID.—DEVOLUTION OF THE PROPERTIES WHICH WERE THE OBJECT OF THE SECULARIZATION.—The Spanish Government having recognized the exclusive ownership by the church of the properties which were the object of the secularization and which remained in the possession of the Government subject to exchange, the fact that such an exchange was not effected in Porto Rico and that the Government of the Island issued innumerable orders directing the sale thereof for account of the State, cannot deprive the church of its right of ownership thereof, because such orders were not made with its consent, as was necessary in order to render ineffective the concordats with the Holy See.

ID.—EXCHANGE FOR GOVERNMENT BONDS.—In order that the Spanish Government might have acquired the ownership of the properties which were secularized, and in order that it might have been deemed the lawful owner thereof, it was necessary that they should have been exchanged for Government bonds from the income of which the church could have defrayed its expenses.

ID.—RIGHTS OF THE CATHOLIC CHURCH TO THE PROPERTIES PROCEEDING FROM THE RELIGIOUS COMMUNITIES KNOWN AS THE FRANCISCAN AND DOMINICAN FRIARS—TREATY OF PARIS.—The ownership of the properties proceeding from the religious communities known as the Franciscan and Dominican Friars which the Government of Porto Rico seized and held in its possession at the exchange of sovereignty in this Island and included in the cession made by Spain to the United States of all the real property pertaining to the public domain belongs to the Catholic Church, which has not lost its right of ownership because it is protected by the provisions of the Treaty of Paris.

ID.—ACTION FOR RECOVERY—OWNERSHIP OF THE THING DEMANDED.—Although it is an indispensable requisite to the success of actions for the recovery of property that the plaintiff establish his ownership of the thing sought to be recovered, and the church basing its right of ownership to the properties secularized upon the concordat celebrated by the Holy See and the Spanish Government, and on the additional agreement thereon entered into by the same parties, the church cannot be required to show a more perfect title inasmuch as in the said contract and additional agreement, it was solemnly acknowledged that the church was the owner of those properties, and the Government bound itself to return them to it.

ID.—CAPACITY OF BISHOPS TO REPRESENT THE CHURCH.—The capacity of the Bishop of Porto Rico to represent the church in the case at bar cannot be successfully attacked, because aside from the fact that the bishops represent the church in their respective dioceses in accordance with the canons of the Catholic Church, such representation has been expressly acknowledged by the concordats in every matter concerning the delivery and exchange of the properties referred to thereby.

ID.—TITLE OF RELIGIOUS COMMUNITIES TO THE PROPERTIES SECULARIZED.—The church in the case at bar having made a claim to the properties seized by the Spanish Government from the religious communities known as the Franciscan and Dominican Friars, and the ownership of such properties by the church having been acknowledged by the concordats, the title of ownership held by the said religious communities to the property is not a question for discussion in this case; but the only thing to be determined is the identity of the properties demanded from The People of Porto Rico—that is to say, whether or not these properties form a part of those which the Spanish Government seized from the said religious communities.

ID.—PRESCRIPTION OF ACTIONS.—The period for all classes of actions, in the absence of provisions to the contrary, commences to run from the day on which such actions might have been brought.

ID.—ACTION OF THE CHURCH TO RECOVER ITS PROPERTY.—The church being bound by the concordats celebrated by the Holy See and the Spanish Government was without a right of action to compel the Spanish Government to deliver its properties to it until the change of sovereignty, when Spain ceded to the United States, among other properties, those which had belonged to the religious communities the exchange of which was pending, since that act constitutes a violation of the agreement of 1859, the church from that moment was legally entitled to demand the delivery of its properties and recover the same by any of the means in its power; and it is from that date that prescription of its action commenced to run, the period for such prescription being thirty years.

ID.—ACQUISITION OF OWNERSHIP BY PRESCRIPTION.—In order to acquire the ownership of real property by prescription, even where the period of prescription is more than thirty years, it is necessary in addition to possession for the time required by the law, that the thing be possessed in the capacity of owner; for which reason The People of Porto Rico as the successor in interest of the Spanish Government cannot allege prescription as a means of acquiring the ownership of the properties involved in this litigation, because its predecessor in interest knew perfectly well that the ownership of those properties was in the church, and that it could only acquire them by a solemn compliance with the stipulations of the concordats.

ID.—PROPERTIES IN THE POSSESSION OF THE UNITED STATES.—The Government of the United States not having been made a party to this action, the court cannot make any disposition whatever in regard to the properties proceeding from the religious communities which were ceded by the Spanish Government and which are at the present time in the possession of the Government of the United States.

The facts are stated in the opinion.

*Mr. Hernández López* for plaintiff.

*Messrs. Sweet, Attorney General, and Hartzell and Rodríguez Serra* special counsel for defendant.

Mr. Chief Justice Quiñones delivered the opinion of the court.

Attorney Juan Hernández López, in the name and on behalf of the Right Reverend Catholic Bishop of this Diocese of Porto Rico, as such, and consequently with all the rights of representation and powers vested in him as the diocesan prelate of the Roman Catholic Apostolic Church in this Island, and in accordance with the authority under the provisions of the Act of the Legislative Assembly of March 10, 1904, filed the complaint which is the subject of this controversy in the Supreme Court against The People of Porto Rico, seeking a judgment directing said defendant to return to the Roman Catholic Apostolic Church the property it holds, emanating from the religious communities of Dominican and Franciscan Friars which existed in this city and were suppressed, and which property the Government of this Island seized in the year 1838 under the so-called laws of secularization of church property, published in Spain; and although it has subsequently been held to be the exclusive property of the Roman Apostolic Church, as all other property of the same origin in the possession of the Government of Spain, and the latter had contracted the solemn obligation of returning it to the Catholic Church, in accordance with the provisions of the Concordat concluded with the Holy See in the years 1851 and 1859, the Spanish Government in Porto Rico had never done so, but retained in its possession the property of the suppressed religious communities until the change of sovereignty in this Island, the same subsequently passing, under the Treaty of Paris, to the Government of the United States, and from the latter to The People of Porto Rico, which now possesses and enjoys it. He likewise prayed, as a consequence of such return, that The People of Porto Rico be adjudged to pay to the Roman Catholic Apostolic Church the rents and

products which the properties returned have produced or which they should have produced, from October 18, 1898, to the date of the return thereof, such rents and products to be fixed by this court upon a report of experts, in accordance with the law; and to pay, besides, the amount of annuities redeemed by the estates subject thereto between said date and the present date, or such as may be subsequently redeemed until the judgment is executed, as also legal interest on these sums at the rate of 6 per cent per annum, with the costs of the action likewise against the defendants.

The principal ground of the complaint is based upon the fact that the church having become separated from the State as a consequence of the change of sovereignty, and being left without any means with which to meet its requirements, because on the very day on which this Island was occupied by the American army it ceased to receive the amount appropriated in the budget to provide for the expenses of worship and the clergy, in accordance with the provisions of the concordats concluded with the Holy See, it was but reasonable and just that the property belonging to it now in the possession of the Government of Porto Rico should be returned to it, the rights of ownership to which it had not lost by the cession thereof to the United States under the Treaty of Paris because, according to article 8 of said treaty, the cession made by Spain of the property which under the law was of the public domain, and as such belonged to the Crown of Spain in this Island, should be understood, and was understood, to be without prejudice to the rights of ownership of civic or ecclesiastical corporations, or of any other bodies having legal capacity to acquire and to possess property in the territories ceded or relinquished or to private individuals of whatsoever nationality, this article applying precisely to the Catholic Church, whose capacity to acquire and possess property is absolutely indisputable.

The properties constituting the subject matter of the claim of the Catholic Church were described in the complaint, some

of them individually and others with reference to two certificates attached thereto, one issued by the Commissioner of the Interior, W. H. Elliott, on January 8, 1905, and the other by the Treasurer of Porto Rico, W. F. Willoughby, on February 24 of the same year, having reference to certain proceedings had in the former General Economic Administration of this Island, instituted in the year 1871 and relating to property derived from the regular clergy which was considered the property of the State and subject to the effects of the secularization laws in accordance with the Royal Order of July 27, 1865, for which reason counsel for the Catholic Church sought to have said certificates made a part of the complaint; for the attorneys for The People of Porto Rico having objected to this and having requested that the representative of the church present a bill of particulars enumerating and describing all of the properties individually, counsel for the Catholic Church did so, presenting a detailed and succinct statement of the properties claimed by the church, comprising all of them, and upon its admission by the court it was ordered to be joined to the record.

The complaint of the Catholic Church has been contested by The People of Porto Rico on a number of grounds alleged in its amended answer and which we will take up later. For the present we will confine ourselves to an examination of the historical antecedents of this interesting matter in order then to determine whether or not the complaint of the Catholic Church is a just one.

It is actually a fact, as shown in an incontrovertible manner, by the evidence introduced in this action, that some time about 1837 and 1838, and for many years before, there were in this city of San Juan two religious communities of Dominican and Franciscan Friars, of which the former resided in a convent publicly considered to be their property, called Santo Domingo, situated in the northern part of the city, the same building now occupied by the offices of this Supreme Court

and of the district court on the upper floor and by some military dependencies on the lower; and the latter—that is to say, the Franciscans—in another convent called San Francisco, situated on the *plaza* of the same name in this city, now occupied, so we understand, by the High School of San Juan. Both buildings are described in the bill of particulars submitted by counsel for the Catholic Church.

In addition to these convents and another convent which the Dominicans had in the city of San Germán, called Santo Domingo-Portacelli, said religious communities possessed many other properties, consisting of rural and urban estates of no little value, and a great number of annuity-earning endowments which produced large revenues, with which they met the expense of their maintenance and the requirements of Divine worship in the churches annexed to their respective convents.

Upon the extinction of religious communities in Spain and the seizure by the State of all their property under the so-called secularization laws, the communities of Dominicans and Franciscans established in this capital suffered the same fate, this taking place in this Island about the year 1838. Affairs continued in this state for a few years longer until, upon the termination of the Carlist War, which had exerted so much influence upon the hostile attitude of the Government toward the clergy because they were believed to be partisans of the Infante, Don Carlos, who was a pretender to the Crown of Spain and was said to receive great financial assistance from the religious communities, normal conditions having been restored the Cortes enacted and the Queen of Spain, Isabella II, sanctioned the law of May 8, 1849, by which the Government was authorized to enter into negotiations with the Holy See to settle the matter of the clergy and all questions pending between both powers. Through these negotiations the arrangement sought was actually reached, the famous Concordat of March 16, 1851, being concluded between the Holy See— then occupied by His Holiness Pope Pius IX—and Her

Majesty the Queen of Spain, Isabella II, through their respective high commissioners, which arrangement has since formed part of the public law of Spain, under which a multitude of questions pending between the Holy See and the Spanish Government were actually settled, the most important thereof being, for our purpose, those relating to the secularization of church property, which, in view of their importance in the decision of the questions at issue in this litigation, we will transcribe below in full.

In fact, article 35, which treats of the maintenance of religious communities of women, whose property had also been seized by the Government under the said secularization laws, provides the following in its last paragraph:

"There shall be returned at once and without delay to said religious communities, and on their behalf, to the diocesan prelates in whose territories are to be found the convents, or where they stood prior to the recent vicissitudes, all property belonging to them now held by the Government which has not been alienated. But His Holiness, taking into consideration the present state of such property and other special circumstances, in order that the expenses of worship and other general expenses may be met with the proceeds therefrom in a more equitable manner, directs that the prelates on behalf of the religious communities owning the same, proceed immediately and without delay to sell said property at public auction conducted in canonical form and with the intervention of a person appointed by the Government of Her Majesty. The proceeds from these sales shall be converted into nontransferable 3 per cent bonds of the debt of Spain, the principal and interest of which shall be distributed among the said convents in proportion to their needs and circumstances in order to provide for the expenses referred to and the payment of the pensions of the nuns entitled thereto, without prejudice to the Government's providing, as heretofore, what may be necessary to make up the full payment of such pensions until the death of the pensioners."

Article 38, in speaking of the funds to be applied to the maintenance of worship and the clergy, provides the following among other things:

"There shall furthermore be returned to the church at once and without delay all such eccleciastical property as is not comprised in

the law of 1845 and which may not have been alienated as yet, including that remaining from the religious communities of men. But in view of the present circumstances of such property, and the evident profit to be accrued to the church, the Holy Father orders that the capital it represents be immediately and without delay converted into nontransferable 3 per cent bonds of the debt of the State, observing therefor the form and rules established in article 35 with reference to the same of property of the religious communities of women.''

Article 40 provides:

''That all such property and income belong to the church, and shall be enjoyed and administered in its name by the clergy.''

Article 41 provides:

''That the church shall, moreover, have the right to acquire under any legal title, and its present property, or that which it may hereafter acquire, shall be solemnly respected.''

Article 42:

''That in view of the benefit of this agreement to religion, the Holy Father, at the instance of Her Catholic Majesty, and to contribute to the maintenance of public tranquillity, decrees and declares that the persons who may have purchesad, during the recent events, ecclesiastical property in the dominions of Spain under the civil provisions then in force, and who may be in possession thereof, and those who may have succeeded or may succeed to the rights of such purchasers, shall at no time and in no manner be molested by His Holiness nor by the high pontiffs succeeding him, but on the contrary they, as well as their successors in interest, shall enjoy in security and peace the ownership of such property and its emoluments and products.''

And article 45 provides:

''That by virtue of this concordat all laws, orders and decrees heretofore published in any manner or form in the dominions of Spain shall be considered as repealed in so far as they are opposed thereto, and the said concordat shall govern forever hereafter as the

law of the State in said dominion. And therefore, both contracting parties, bind themselves and their successors to the faithful observance of each and every one of the articles contained therein. Should any difficulty arise hereafter, the Holy Father and Her Catholic Majesty shall come to an agreement for the purpose of reaching a friendly settlement."

The provisions of the convention supplemental to the Concordat of March 16, 1851, are still more interesting than the provisions transcribed. This convention was concluded between the Holy See and the Government of Spain on August 25, 1859, under the authority granted the latter by the law of November 4 of the same year to conclude and ratify a convention with the Holy See for the main purpose of exchanging all ecclesiastical property for nontransferable 3 per cent consolidated bonds, and to represent by bonds of the same character the remainder of the allowance for worship and the clergy, if the respective dioceses should so agree, reserving to the church the right to acquire property vested in it by article 41 of the concordat, and without reckoning in its allowance the amount of the income it might subsequently acquire.

The principal provisions of this convention with reference to our object are the following, which, owing to their great importance, we also transcribe.

In the preamble of said convention it is stated that the Supreme Pontiff, Pius IX, and Her Majesty Isabella II, of Spain, being desirous to provide by mutual agreement for the final settlement of the endowment of the worship and the clergy in the dominions of Her Majesty in conformity with the solemn Concordat of March 16, 1851, had appointed their respective plenipotentiaries who, after having exchanged their full powers, had agreed as follows:

"Article 1.—The Government of Her Catholic Majesty, considering the lamentable vicissitudes through which ecclesiastical property has passed at different periods, and desiring to assure to the church perpetually the peaceful possession of her property and rights and

to avoid anything which might lead to a violation of the solemn concordat concluded on March 16, 1851, promises the Holy See that hereafter no sale, exchange, nor any other kind of alienation of such property shall be made without the authorization of said Holy See.

"Article 2.—Being desirous definitely to carry out the endowment of worship and the clergy, prescribed in said concordat, in a certain, stable and independent manner, the Holy See and the Government of Her Majesty agree upon the following points:

"Article 3.—In the first place, the Government of Her Majesty again formally recognizes the full and unrestrained right of the church, to acquire and hold as owner all kinds of property and securities, and to enjoy the usufruct thereof, without any limitation or reservation whatsoever; consequently any provision in contravention of this covenant is hereby repealed and specially in so far as the law of May 1, 1855, may be opposed thereto.

"The property which the church may hereafter acquire and possess by virtue of this right shall not be computed in the endowment assigned it under the concordat.

"Article 4.—By virtue of said right, the Government of Her Majesty recognizes the church as the absolute owner of each and every one of the properties returned to it under the concordat. But in view of the state of deterioration of most of the property which has not yet been alienated, the difficulty of its administration and the different contradictory and inexact computations of their income value, all of which circumstances have caused the endowment of the clergy to become uncertain and even incongruous, the Government of Her Majesty has proposed to the Holy See an exchange, giving to the bishops the power to determine, with the concurrence of their chapters, the price of the property of the church situated in their respective dioceses, the former offering in exchange for all such property and its assignment to the State as many nontransferable 3 per cent bonds of the consolidated debt of Spain as may be necessary to cover the entire value of such property.

"Article 7.—After the appraisal by the bishops of the value of the property subject to exchange, nontransferable bonds shall be delivered to them at once, both for the full value of such property and for the market value of such property as may have been alienated after the concordat. Upon such delivery the bishops duly authorized by the Apostolic See shall make a formal assignment to the State of all the property subject to exchange under this convention.

"The bonds shall be assigned to the clergy as an integral part

of their endowment, and the respective diocesans shall apply the income accruing therefrom to cover said endowment in the manner prescribed by the concordat.

"Article 8.—In view of the peremptory character of the needs of the clergy the Government of Her Majesty engages to pay the consolidated income due each diocese monthly.

"Article 9.—In the event that, by provisions of the temporal authorities, the interest of 3 per cent on the public debt of the State should suffer any reduction or diminution, the Government of Her Majesty hereby binds itself to give to the church as many nontransferable bonds of the issue which may substitute the 3 per cent securities, as may be necessary to cover in full the annual revenue from the issue about to be made in favor of the church; so that this income is never to diminish or be reduced in any event or at any time.

"Article 20. In view of the benefits to the church from this new convention, His Holiness, upon the repeated requests of Her Catholic Majesty, has decided to extend and does extend, the waiver of all claims, as contained in article 42 of the concordat, to the ecclesiastical property alienated by reason of the said law of May 1, 1855.

"The exchange of the ratifications of this convention shall take place within a period of three months, or before if possible."

This convention was signed in Rome by the respective plenipotentiaries on August 25, 1859, and having been subsequently ratified by the high contracting parties on November 7 and 24, of the same year, it was ordered, executed and complied with in every respect by the law of April 4, 1860, which reads as follows:

"Doña Isabella II, Queen of Spain, by the Grace of God and the Constitution of the Spanish Monarchy, to all who may see and understand these presents, *Know Ye*: That availing myself of the authority vested in my Government by the law of November 4, 1859, to conclude and ratify a convention with the Holy See for the main purpose of exchanging ecclesiastical property of any kind for nontransferable 3 per cent bonds of the consolidated debt and to represent by bonds of the same character the endowment for worship and the clergy, reserving to the church the right to acquire property embodied in the last concordat,

"I hereby order that the convention concluded with the Holy See

on August 25 and ratified on November 7 and 24 of last year, which reads as follows, be published and observed as a law of the State."

Then follow the provisions of said convention, with which we are already familiar.

Now, then, in view of the stipulations contained in the Concordat of March 16, 1851, and in the convention supplemental thereto of which we have just spoken, there can be no question as to the perfect right of ownership of the Roman Catholic Apostolic Church over the property seized from the religious communities by virtue of the so-called secularization mortmain laws, which property was in the possession of the Government at the time of the publication of the first of said concordats, and which remained in the possession after the supplemental convention of 1859, pending the exchange thereof in the new form agreed with the Holy See, at the suggestion of the Spanish Government.

This exchange was effected in all or most of the dioceses of Spain, in pursuance of the provisions of the Government to carry it out, among others the Royal Decree of August 21, 1860, which contains the rules to be observed for the proper execution thereof; but this is not the case in the Islands of Cuba and Porto Rico, in which the provisions of the concordat relating to the return to the Catholic Church of the property seized from the religious communities were never carried out, nor was the exchange made in the manner agreed with the Holy See nor in any other manner, notwithstanding the specific admonitions on the subject addressed by the Queen of Spain, Isabella II, to the superior authorities of the Island of Cuba in her Royal *Cédula* of November 26, 1852, which, although issued for that island only, contains declarations upon some of the questions at issue in this litigation which by analogy are perfectly applicable to this case.

As a matter of fact, the Queen of Spain says the following in the preamble of the said royal *cédula:*

"It being one of my first duties as well as the most glorious gem

of my crown, to be worthy of the name of Catholic which I have inherited from my august and pious progenitors, my most earnest endeavor has been, as soon as, through divine mercy, peace was restored in the Kingdom, to resume by means of the last concordat the relations with the Holy See which had been temporarily interrupted by civil war, convinced as I am that the first and indispensable basis for the prosperity of a people is found in their religious belief, without which brotherhood and Christian charity cannot exist, nor can the habit of submission and respect due the authorities be contracted.

"Prompted by these sentiments and persuaded that the rapid growth during the last twenty-five years in the population and wealth of that island demanded a proportionate increase in ministers of the worship and of their endowments, in order that none of those, my loyal subjects, should lack the necessary spiritual nourishment, I directed such data to be gathered as I deemed advisable, and in view thereof decided to issue the royal *cédulas* which I communicated to you under date of September 30, last, relating to the endowment and organization of the worship and the parochial diocesan clergy of that island. But if, as I confidently hope, the habitual and most urgent necessities of a Catholic people may be met by these measures, they in themselves would not be sufficient to fill the void, which, in this particular, must have been left by the reduction and extinction almost of the religious orders brought about by the superior authorities of that island in the year 1851 last, during my minority, without proper authority from the Government, which, withholding its full approval for the time being ordered an inquiry to be instituted upon this most important matter, in accordance with the recommendation of the colonial advisory board."

And then, in the fifth provision of said royal *cédula*, Queen Isabella II says:

"Although the last concordat concluded with the Holy See mostly refers to the personnel, circumscription and government of the churches of the peninsula, yet it is applicable with respect to governmental acts, to all my dominions, as expressly stated in several of the first articles thereof and especially in article 42, as to all matters relating to the alienation of church property; and as it is determined by article 38 thereof that all church property not sold shall be returned to the church without delay, including what is left belonging to the religious communities of men, you will, in fulfillment of this

solemn promise, with the concurrence of the superintendent of my royal treasury and the intervention of the respective diocesans, proceed to take an inventory of all the annuities and rural and urban estates.that have belonged to the religious communities and have not been alienated; but as the conversion thereof into nontransferable bonds of the state debt is not applicable in those countries, as provided by the same article, and desiring to make up for the deficiency of this provision in the most adequate manner, I direct that, upon the termination of the inventory, the superintendent execute in my royal name a formal obligation in favor of the church, and on its behalf, of the respective diocesans where the estates are situated, to apply to their needs and especially to the maintenance and support of the religious institutions to which this *cédula* refers—since the endowment for worship and the secular clergy of the island is assured by the *cédulas,* I was pleased to issue on September 30, last—all the proceeds obtained from the sale of such property, subject to annuities, in accordance with the instructions which I shall issue later, giving preference therefor to such information upon the subject as you may furnish me with the concurrence of said superintendent and reverend prelates.''

The declaration made by the Queen of Spain in this royal *cédula* are convincing beyond a doubt, not only as to the provisions of the concordat being in force in these colonial dominions, with respect to the acknowledgment in favor of the Catholic Church of the exclusive ownership of the property seized from the regular clergy and the exchange agreed with the Holy See, but also as to the fact that the religious communities were suppressed and their property subsequently seized by the superior authorities of both islands without the authority of the Government, which withheld its approval for the time being.

In this Island of Porto Rico the Government also made provision for the needs of the Catholic Church, by Royal *Cédula* of April, 20, 1850, relating to the organization of and endowment for worship and the clergy, the expenses of which the Government assumed, as agreed in the concordat concluded with the Holy See; and although nothing was done with respect to the return of the property of the regular clergy to the

Catholic Church, and its exchange, but, on the contrary, the Government issued numerous provisions for the purpose of effecting the sale thereof for account of the State, such provisions cannot, in good logic, deprive the Catholic Church of its right of ownership in said property, as they were not issued with its assent and agreement, as was absolutely necessary in order to leave without effect the concordats concluded with the Holy See, on behalf of the Catholic Church, precisely in one of its most important points, namely, the acknowledgment by the Government of Spain of the right of ownership of the church in the property of the religious communities, which was in its possession on the date the concordat was concluded, and the solemn obligation contracted by the Government to exchange such property for securities of the public debt of Spain, so as to provide for the needs of the church with the income therefrom; without which requisite the Government could not acquire the ownership of such property and consider itself the legal owner thereof.

It is therefore evident, and there can be no doubt on the subject, that the property derived from the religious communities of Franciscans and Dominicans seized by the Government, and which was in its possession at the time of the change of sovereignty in this Island and included in the cession made by Spain to the United States of all real property of public ownership in Porto Rico, belonged to the Roman Catholic Apostolic Church, which has not lost its right of ownership, protected as it is by the Treaty of Paris, Article VIII, whereof left unimpaired acquired rights, as we have already observed.

Having thus established in principle the right of ownership of the Roman Catholic Apostolic Church in the property derived from the communities of Franciscans and Dominicans in the possession of the Government of this Island, at the time it was ceded by Spain to the United States, let us now enter upon an examination of the exceptions of the representatives of

The People of Porto Rico to the complaint filed by the Catholic Church.

The first is that relating to the title of ownership of the church to the property, subject matter of the claim in question; for it being an incontrovertible principle, of the former as well as of the modern law of procedure, that in order to be successful an action for recovery, to which class belongs the one interposed in the complaint, the plaintiff must establish the ownership of the thing he claims. Until the Catholic Church complies with this requisite and presents its title of ownership to the property, subject matter of the action brought, such action cannot be successful and must be dismissed.

But this objection of The People of Porto Rico is absolutely inefficient in this case; the Catholic Church bases its right of ownership upon the stipulations of the concordat concluded between the Holy See and the Government of Spain on March 16, 1851, and upon the convention supplementary thereto concluded between the same high contracting parties on August 25, 1859, according to which the Government of Spain, which had seized all the property of the religious communities and which still had some of it in its possession, solemnly recognized the ownership of such property in favor of the Catholic Church and obligated itself to return such property immediately and without delay, although on account of the special circumstances surrounding such property and other considerations, both contracting parties agreed that it would be exchanged for nontransferable 3 per cent bonds of the consolidated public debt of Spain, upon the basis of its value to be fixed by the bishops, in concurrence with their chapters in their respective dioceses, in order to provide the church with a source of income with which to meet the expenses of Catholic worship.

The title of ownership of the church cannot be more evident; it is constituted by the concordats concluded between the Holy See and the Crown of Spain, which partake of the

character of real international agreements, and which as dip-
lomatic documents, have all the formalities necessary to make
them authentic and form part of the Spanish public law con-
tained in the legislative collection of Spain.

Therefore, the first objection of The People of Porto Rico
to the complaint of the Catholic Church must be dismissed.

The same is to be said with respect to the capacity of
the Catholic Bishop of Porto Rico to represent the Catholic
Church in this litigation.  Bishops represent the church in
their respective dioceses in accordance with the canons of the
Catholic Church, and such representations were specially rec-
ognized in them by the concordats in everything pertaining to
the delivery of the property to the bishops and exchange there-
of in the manner agreed upon between the two powers.

With regard to the title of ownership of the Franciscan
and Dominican Friars to the property forming the subject
matter of the claim herein, which constitutes another objection
made to the complaint by counsel for The People of Porto
Rico, we believe that this is a point absolutely foreign to the
question at issue, and consequently, that it should not be dis-
cussed.  An investigation of the title of ownership of the
Dominican and Franciscan Friars to the property claimed in
the complaint is not involved here.  The question here is to
ascertain whether such property, the delivery of which by The
People of Porto Rico, is sought by the Catholic Church, does
or does not form part of the property which the Government
took from said religious communities when it seized their
property about 1838, under the secularization laws, and the
ownership of which was recognized by the concordats in favor
of the Catholic Church, and which the Spanish Government
agreed to return to it in the form mentioned, without any con-
ditions or reservations whatsoever, and leaving out all con-
sideration as to the titles of ownership which the Franciscan
and Dominican Friars might have therein, regarding which no
question was raised, either before or after the concordat.  This

is all that is discussed here. The other objections of the representative of The People of Porto Rico that the Catholic Church has not proved the title of the Friars to the ownership of the land, subject matter of the complaint in this action, and that the convents, the delivery of which the church seeks, instead of being the property of said religious communities, were built by the Government at its own expense and afterwards assigned to the Friars as a place of residence—a point on which, we may say in passing, The People of Porto Rico have not attempted to adduce proof—are all of them superfluous and cannot be made the subject of discussion in this action.

The only question at issue here, as we have said, consists in determining whether or not the properties claimed in the complaint are of those seized by the Government from the Franciscan and Dominican Friars in connection with the suppression of said religious communities; and this question, which we might call the identification of the thing claimed, is so clear that there can be no doubt about it. In the first place, because it has been specifically recognized by The People of Porto Rico in their amended complaint; and in the second place, because it appears perfectly clear from the documents which have been introduced as evidence in these proceedings by both parties.

The fact is, as we have stated above, that the record contains a list of the properties claimed by the Catholic Church, and if we compare it with the inventories made by the commission which intervened in the occupation of the properties of said religious communities when the Government seized them in the year 1838, and with the certificates of the Commissioner of the Interior and Treasurer of Porto Rico attached to the complaint, and with that presented afterwards at the trial by counsel for the Catholic Church, also issued by the Treasurer, we will see that they agree perfectly, the only difference being that the lots occupied by Ballajá Barracks, the insane asylum and the market place do not appear in the inventory under these names, but form part of the lots assigned

to the Dominican Friars by the conqueror and first populator of the Island, Juan Ponce de León, in the northern part of this city, for the establishment, and foundation of their convent, and figures in the inventory of the property seized from said religious community; and with regard to the annuities, it has been proved only that The People of Porto Rico hold those mentioned in the certificate of the Treasurer produced at the trial by counsel for the Catholic Church, amounting in all to the sum of $19,764.23, but not the others mentioned in the list of properties claimed in the complaint, no doubt because of the omission of those redeemed between the date the Government seized them in 1838 and the present date. Of these inventories prepared by the commissioners who intervened in the seizure of the properties of the suppressed religious communities there are of record copies presented as evidence by counsel for the Catholic Church, against the correctness of which no objection has been made by the other side; and it is a fact that in the inventory taken of the documents seized from the Dominicans, appears the title of ownership to the lots assigned to the community by Conqueror Juan Ponce de León, which document seems to have been lost, but of the existence whereof there can be no doubt because it is referred to not only in the inventory to which we have alluded, but also in other records of proceedings on file in the Government offices which have been brought to this trial as evidence by counsel for the Catholic Church.

Upon this point of the identity of the properties claimed by the Catholic Church as a part of those taken from the religious communities of Dominicans and Franciscans when the Government seized all their properties, neither can there be the slightest doubt. It is a very clear point upon which the official documents on file in the record throw a strong light.

Setting aside this point therefore, let us now examine the question of prescription, which is another of the exceptions of The People of Porto Rico to the complaint.

The representative of the defendant alleges on this point

that inasmuch as more than sixty years have elapsed between the year 1838, when the Government of Porto Rico seized the property of the Friars, and the date of the complaint, throughout which long period of time the Catholic Church has made no claim whatsoever to obtain possession of its property, it no longer has a right of action to do so, because much more than the thirty years fixed in section 1864 of the Civil Code in force for the prescription of the action of ownership upon real property, have elapsed since that date.

But apart from the fact that the term for the prescription was interrupted by the concordats concluded between the Spanish Government and the Holy See in the years 1851 and 1859, in which the Government of Spain recognized that the ownership of such property was vested in the Catholic Church, and solemnly obligated itself to return it to the church in a specific form; and although it afterwards began to run again, it is a fact that the church, not having been in a legal position to claim the return of such property from the Government until the year 1898, when the change of sovereignty in this Island took place, from said date should the period for prescription be counted, and as only six years more or less have elapsed between that time and the filing of the complaint, it is evident that the exception of prescription of the right of ownership is founded in this case and that it cannot prevent the success of the action prosecuted.

According to section 1870 of the Civil Code in force, which is an exact reproduction of article 1969 of the former Code, "the time for the prescription of all kinds of actions, when there is no special provision to the contrary, shall be counted from the day on which they could have been instituted;" and we have already seen from the summary we have made of the provisions of the concordat concluded with the Holy See that although articles 35 and 38 of that concluded in 1851, provided that the Government should return to the Catholic Church the property of the clergy, immediately and without delay, including that still remaining of the property seized from the

religious communities of both sexes, in order to be sold by the bishops at public auction, for the purpose of investing the proceeds therefrom in bonds of the public debt of Spain, that stipulation was afterwards materially modified by the convention supplementary to the concordat, concluded with the Holy See on August 25, 1859, according to which the property of the Catholic Church in the possession of the Government would be exchanged for 3 per cent bonds of the public debt of Spain, in the form prescribed in articles 4 and 5 of said convention; and it is clear that the church, being bound to comply with the exchange agreed on, had no right of action to demand the delivery of its property from the Government. But then came the war between Spain and the United States which was terminated by the Treaty of Paris, under which Spain ceded this Island to the United States of America, with all its buildings, wharves, barracks, forts, structures, public highways and other immovable property, which, in conformity with the law, belonged to the public domain, and as such belonged to the Crown of Spain, including that taken from the former religious communities and in possession of the Government, pending its exchange in the form agreed with the Holy See; and as this act implied on the part of the Spanish Government a manifest violation of the convention supplementary to the Concordat of 1851, concluded with the Holy See on August 25, 1859, because without having paid the value of said properties through their exchange for bonds of the public debt of Spain or in any other equivalent form, it could not acquire the ownership thereof for the purpose of ceding them as it did to the Government of the United States, it is clear that from that moment the Catholic Church was in a perfect position to demand the delivery of such property, whose ownership had been solemnly recognized in its favor by the Government of Spain in the concordats concluded with the Holy See in 1851 and 1859, which ownership, despite the fact that such properties had been ceded to the United States, it had not lost, and

could assert throught the exercise of the proper action of ownership for the recovery thereof from whomsoever might have them in his possession—that is to say, The People of Porto Rico—who now possesses and enjoys them under the well-known juridical aphorism, *"res ubicumque sit pro dominio suo clamat;"* and as not more than six years have passed between the time the Catholic Church could validly bring its action of ownership and the date of the filing of this complaint, it is evident that in this case the term prescribed by law for the exercise of the action of ownership over real property, which is thirty years, has not elapsed, and that, for this reason, the exception of prescription pleaded by The People of Porto Rico in their amended answer to the complaint, does not lie.

This with respect to the prescription as a means of extinguishing an action of ownership. Nor is such prescription, as a means of acquiring ownership, applicable to the case, because in order to acquire ownership of real property by prescription, even where prescription is for more than thirty years, it is necessary, under section 1842 of the Civil Code in force concordant with article 1941 of the former Code, that, in addition to the time of possession required by law, the thing be possessed under title of ownership, and the Spanish Government knew perfectly well that the property in question belongs to the church, and that it held such property only pending its exchange in the form agreed with the Holy See, or in some other adequate form, and that only after the value thereof had been delivered to the church and the bishops had conveyed it with the authority of the high pontiff, would it have acquired the ownership thereof in accordance with the provisions of article — of said supplementary convention of August 25, 1859.

Finally, there is still to be considered one more objection made by The People of Porto Rico to the complaint of the Catholic Church, namely, that relating to the Convent of Santo Domingo and the lands annexed thereto, and the lot

upon which Ballajá Barracks is located, upon which points the defendant alleges in its answer to the complaint, that such property, not being in its possession inasmuch as the President of the United States had reserved it for military purposes, under the authority vested in him by an act of Congress, nothing can be definitely decided in this action upon said real property because the Government of the United States is not a party hereto.

On this point we have nothing to oppose to the statement of the representative of The People of Porto Rico. The objection is well taken; but we must say that the evidence heard in this action also shows that said Convent of Santo Domingo with the lands apurtenant thereto, as well as the lots upon which Ballajá Barracks is located, are the property of the Roman Catholic Apostolic Church, and that only upon a technical ground, strengthened by the respect we have for a decision of the President of the United States, we will not make the same pronouncement with regard to said property—that is to say, that it be returned to the Catholic Church, together with the other property sought to be recovered in this action.

We understand, therefore, that with this single exception, the Catholic Church should be restored in the possession of all other properties belonging to it which The People of Porto Rico are improperly possessing and enjoying, and that judgment should be rendered to this effect in this action, this Supreme Court thus repairing the act of despoliation committed by the Government of Spain against the Roman Catholic Apostolic Church in ceding and conveying to the Government of the United States the property belonging to it to which this complaint refers without having previously acquired the same in the form agreed upon in the treaties concluded with the Holy See, conformably to the principles of international law once more proclaimed by the Treaty of Paris under Article VIII thereof. Nor is the doctrine announced by the Supreme Court of the United States in the case of *Castana* v. *The*

*United States* an obstacle to the application of these principles in this case according to which ''although it is the duty of a nation receiving the cession of territory to respect property rights as recognized by the nation making the cession, it is under no obligation whatever to correct the errors committed by the ceding nation against an individual prior to the cession, unless the act of dispossession or error committed by the ceding nation was so recent at the time of the making of the cession that the party dispossessed could not have resorted to the courts of the ceding nation to obtain relief, and in such case it might be the duty of the nation receiving the ceded territory;'' which is precisely the case involved, because the act of despoliation committed against the Catholic Church is so recent, it having been consumated exactly when the American Government took possession of this Island in virtue of the cession thereof made by the Government of Spain, that the Catholic Church has not been able to obtain a remedy in any form other than by this action, and consequently, we have to deal with the same exception as the one to which the Supreme Court of the United States refers in the case cited above.

In view of all these considerations we believe that the complaint should be sustained, and, consequently, that The People of Porto Rico should be adjudged to return to the Roman Catholic Apostolic Church in this Island as properties seized by the Government of the Island from the religious communities of Dominicans and Franciscans suppressed under the laws issued in Spain relating to the secularization of church property, the building known by the name of the Convent of San Francisco, situated on the square of that name in this city, according to the description of said building made by Expert José Canals in his certificate ratified under oath at the oral trial; the lots occupied by the market place and the streets adjacent thereto, and those occupied by the insane asylum, also according to the description thereof by said Expert José Canals; the annuities which The People of Porto Rico are enjoying, likewise belonging to the extinguished communities,

amounting, with the deduction mentioned in the certificate issued by the Treasurer of Porto Rico on January 14, 1903, which is of record, to the sum of $19,764.23, and furthermore, to make restitution of the fruits or rents accrued, and which should have accrued from such property between October 18, 1898, and the date of the execution of the judgment, in accordance with the appraisal made by said Expert José Canals, as also to make restitution of the principals of the annuities redeemed and interest paid into the Treasury of Porto Rico since said date, the amount of which it has not been possible to fix owing to the failure of the Treasurer to issue the certificates upon both these items called for by this Supreme Court on petition of counsel for the Catholic Church besides the legal interest on said sum at the rate of 6 per cent per annum from the date the complaint was filed until payment is made in accordance with section 1075, in relation with section 1060, of the new Code of Civil Procedure, concordant with articles 1100 and 1108 of the former Code; and dismissing the complaint with respect to the convent of Santo Domingo and appurtenant lands, and those occupied by the barracks of Ballajá, without any special taxation of costs.

Before finally closing this opinion we wish to state here, on account of the intimate relation it bears to the case under consideration, as a most interesting precedent, the fact that the claims of the Catholic Church in the Island of Cuba, identical to these formulated by the diocesan prelate of said church in this Island were settled in a most satisfactory manner by the American Government established in that island during the period of the military occupation thereof after the war with Spain. The Catholic Church has obtained the restitution of all of its property, under an agreement or convention concluded with the Government of that island, upon the basis of an option reserved by the latter to buy such property at the value agreed between both parties, within a period of five years, it being further agreed, that until the Government should effect the purchase, it would pay the church an annual

rental of 5 per cent upon the value of such property as. the Government should retain for its own use, allowing the church in addition an indemnity in compensation of the rents or income not received by it between the date of the occupation and that of the signature of the agreement, and paying in ready money the amount of the annuities, with a reduction of a reasonable percentage from the value thereof.

It gives us pleasure to cite this precedent which is publicly known, and which shows the justice of the claims of the Catholic Church in this litigation, these claims, as we have said, being identical to the claims of said church in the Island of Cuba.

*Decided for plaintiff.*

Justices Hernández and Figueras concurred.
Justices MacLeary and Wolf dissented.

### DISSENTING OPINION OF MR. JUSTICE MAC LEARY.

This is a case of original jurisdiction filed in this court under a special act of the Legislature of Porto Rico, passed on the 10th of March, 1904, and entitled: "An Act to confer original jurisdiction on the Supreme Court of Porto Rico for the trial and adjudication of certain property claimed by the Roman Catholic Church in Porto Rico."

Ever since the American occupation of the Island of Porto Rico claims have been made by the Roman Catholic Church, or by some of its members on its behalf, to certain lands, buildings and other property, situated in Porto Rico and in the possession of the American Government. Efforts were continually being made to induce the Government, both here and at Washington, to recognize these claims. After many plans had been discussed and rejected, finally the Insular Legislatures, on the 10th of March, 1904, passed a statute conferring on the Supreme Court of Porto Rico original jurisdiction for the trial and adjudication of all questions between the church and the people affecting property rights, whether real, per-

sonal or mixed, claimed by either party. Power was con-
ferred on this court, by said act, to issue process for witnesses,
and to receive and hear testimony; and direction was given
to use the same procedure, as near as might be, as that pre-
scribed for the district courts in civil cases, full power being
conferred on the court to enter any and all orders and decrees
that might be necessary to a final and full adjudication of all
the claims of either party to the proceedings, authorizing the
issue of all writs or process necessary to enforce the jurisdic-
tion therein conferred upon this court.

The Attorney General of Porto Rico was by the same act
authorized to accept service for The People of Porto Rico of
any citation, summons or other process issued in the proceed-
ings, and was instructed to commence an action in behalf of
the Insular Government, unless the church should do so with-
in three months after the passage of the act—that is to say,
on or before the 10th of June, 1904.

This court was further directed, after the issues had been
fully submitted upon the law and the facts, and after hearing
the arguments of the respective parties or their counsel, to en-
ter a final judgment and decree, fully determining the rights
of either or both of the parties, and vesting the title to the
subject matter of the controversy, or any part thereof, in
such party or parties as the court might deem entitled thereto.
An appeal was reserved to each of the parties to the Supreme
Court of the United States as in other cases.

This act was approved and took effect on the 10th of
March, 1904. See Session Acts of 1904 pp. 134 and 135.

Whatever original jurisdiction this court has in the case
under consideration is derived from this statute, and from the
Organic Act of Porto Rico.

In accordance with this law the Roman Catholic Bishop of
Porto Rico, through his attorney, Juan Hernández López,
Esq., filed a complaint in this court on the 6th day of June,
1904, asking that The People of Porto Rico be adjudged to

restore to the Roman Catholic Apostolic Church the proper-
ties which the defendant held in possession in the city of San
Juan and in the town of San Germán, and which formerly be-
longed to the communities of friars of the Orders of Santo
Domingo and San Francisco, which orders had been abolished
and whose property the Spanish Government had confiscated
in the year 1838, by virtue of the *Disamortización* Laws.

To this complaint the defendant promptly filed a general
demurrer and special exceptions, which were based on the new
Code of Civil Procedure, which took effect on the 1st of July,
1904. These were fully argued by counsel on both sides on the
24th, 25th and 26th of October, 1904, and taken under advise-
ment until the 10th of June, 1905, and then decided. But inas-
much as the complaint had been filed under the old Spanish
law, after the new Code of Civil Procedure had been passed,
but before it took effect it was held to be sufficient that the
complaint should comply with the former law, and that the
requirements of the new and existing law should not be ap-
plied to it, and the demurrer and exceptions of the defendant
were accordingly overruled. It was also held that the pro-
ceedings in the case should conform to the old law up to the
1st of July, 1904, and after that to the new Code of Civil Pro-
cedure, which took effect on that day. This was strictly in
accordance with the well-established principles that the court
must apply the statute which is in force at the date of the
proceeding under consideration; and that although an act has
already been passed by the legislature it cannot be enforced
by the courts prior to the date on which by its terms it takes
effect. It is very seriously doubted that the court was cor-
rect in overruling the demurrer interposed by The People of
Porto Rico to the complaint filed herein under the old Code of
Civil Procedure; on account of the complaint showing on its
face that the church has not now and never had any title to
the lands sued for, and that the statutes of limitation have
long since run in favor of the defendant and the former own-
ers under whom possession and title is claimed. But it is not

desirable to elaborate this point here since the writer of this opinion did not expressly dissent from the ruling at the time it was made accepting the assurance of the *ponente* that under the old Code of Civil Procedure the complaint was amply sufficient.

The defendant's answer was finally filed on 6th of July, 1905, and it was demurred to on the 12th of August; which demurrer was overruled on 27th of October of the same year. A bill of particulars had in the mean time, on motion of the defendant, been required of the plaintiff, and was filed on the 1st of December, 1905. On the 15th of December the defendant, by leave duly granted, filed an amended answer and the case was set down for trial. Finally on the 15th of January, 1906, the trial was begun and concluded on the 19th of the same month.

The case was taken under advisement by the court and some interlocutory orders were made from time to time, and it was not until the 15th of December, 1906, that the judgment was finally rendered in favor of the plaintiff, the Roman Catholic Apostolic Church, by a divided court; two of the Justices, MacLeary and Wolf, dissenting from the opinion of the majortiy.

There is some question raised in regard to the personality of the plaintiff in this action. It is a little difficult to determine whether the attorney drawing the complaint desired the bishop of the Church, as a corporation, to be considered as the plaintiff. It certainly was not intended by the pleader that the bishop should sue as a trustee or representative of the rights of the extinguished communities of friars, since no allegations whatever indicating such a purpose are included in the complaint.

The relations between the Franciscan Friars and the Dominican Friars on the one part and the Roman Catholic Apostolic Church on the other are not explained either in the pleadings or in the evidence. There is some evidence to show that,

at one time, one or the other of these brotherhoods had possession of certain property described in the complaint, but from all that appears in the record that possession was independent of the Roman Catholic Church and had no connection with that institution. It does not clearly appear which of them, if either, claimed to own or to be in possession of the *censos,* or ground rents or annuities, sued for in this complaint, or to whom such *censos* may have belonged.

This case, at least so far as the lands and buildings are concerned, is simply an action of ejectment between the Roman Catholic Church and The People of Porto Rico, and is, or should be, tried in this court as a court of original jurisdiction, the same as any other ejectment case would be tried between Smith and Brown, or any two ordinary natural persons.

Of course the United States Government was not made a party to this action, as no jurisdiction in such a matter could be conferred on this court by the Insular Legislature. However, several large portions of the real estate involved in this proceeding is in possession of the General Government and never has passed into possession of The People of Porto Rico. This is the case in regard to the Santo Domingo Barracks and the lands appurtenant thereto, and to the block of land on which the Ballajá Barracks are situated. The plaintiff could not possibly recover these buildings and lands in this action and the court very properly "eliminated" them from the claims made by the Catholic Church. It affords me pleasure to remark in passing that, though I cannot agree to the judgment herein rendered in favor of the plaintiff for many reasons, some of which are expressed herein, and others omitted for the sake of brevity, in regard to at least on point my views are in accord with those expressed by a majority of the court. I concur with the *ponente* herein in the proposition that the plaintiff cannot recover in this case the Santo Domingo Barracks or the Ballajá Barracks, or any of those properties which were reserved in the proclamation of the President, as

they belong to the United States, and, if the Roman Catholic Church has any claim upon them, that claim must be presented to the National Government and not to the Insular Government, nor any of its courts. It is only in regard to the other property sued for and adjudged to the plaintiff that there is any dissent among the Justices of this court.

The People of Porto Rico, the corporate body which is made the defendant in this case, was created by the Organic Act, an act of Congress passed on the 12th of April, 1900, and taking effect on the 1st day of May thereafter. See U. S. Statutes at Large, volume 31, chapter 191, pages 77-86.

By section 7 of that act certain inhabitants of this Island "together with such citizens of the United States as may reside in Porto Rico, shall constitute a body politic under the name of The People of Porto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such." The defendant in this case had no existence, as a legal entity, prior to the taking effect of the Organic Act, on the 1st of May, 1900. Of course not being in existence it could not have possession of any of the properties claimed by the plaintiff prior to that time. And in point of fact it did not gain possession of them, at least of the lands sued for, until long afterwards, to wit, on the 30th day of June, 1903. An act of the Congress of the United States was necessary to invest The People of Porto Rico with the title and possession of the lands, buildings and other property involved in this proceeding. This act passed on the 1st day of July, 1902. See U. S. Statutes at Large, volume 32, chapter 1383, pages 731-732.

The judgment herein is against the defendant, not only for the capital sum, but for the interest, rents and profits on the property recovered from the 18th day of October, 1898; being the date on which the Spanish military authorities surrendered the Island to the Americans and sailed away for the Iberian Peninsula. It seems to me that this is an arbitrary date, and, except the fact that it is as early a one as could pos-

sibly be fixed, no reason is apparent for choosing it as a beginning point from which to calculate interest and collect rents.

By the Treaty of Paris, Article VIII, which was ratified on the 11th of April, 1898, this property passed, with all other property of that nature, from the Government of Spain to the Government of the United States; and by the act of Congress of the 1st of July, 1902, and the proclamation of the President of the 30th of June, 1903 (see United States Statutes at Large, chapter 1383, and 33 United States Statutes at Large, p. 2315), a portion of it passed to The People of Porto Rico, and a portion was reserved by the President of the United States under his said proclamation for the use of the military and naval departments of the Nation.

Certainly, in no event can any judgment be rendered against the defendant for any claim on account of interest accruing prior to the 1st of May, 1900, the date on which The People of Porto Rico became a body politic under the Organic Act passed by Congress on the 12th of April previous. Nor indeed could any claim be properly made or legally sustained against the defendant for damages of any description in regard to this property, arising prior to the date of the President's proclamation, the 30th of June, 1903. (33 U. S. Statutes at Large p. 2315.)

During the progress of the trial in this case a large volume of evidence was introduced, including many Spanish laws which were read from the books, or referred to by counsel and considered by the court to have been read. It is provided by the statutes of Porto Rico, which are only declaratory in some particulars of the common law on that subject, that the court may take judicial notice of the following facts. Among others, of whatever is established by laws, of the laws of nature, the measure of time, and the geographical divisions and political history of the world, and the court is authorized in these cases to quote and consult the adequate books or documents. See section 36 of an Act to Regulate the Introduction of Evidence

in Civil Proceedings approved on the 9th of March, 1905. Session Acts of 1905, page 76.

The provisions of the laws of Spain in force and in existence in this Island prior to the 11th of April, 1899, when the treaty of cession was ratified, fall under the class of "whatever is established by law," and can be judicially noticed by the courts of Porto Rico.

We are not authorized by this statute, or any other law known to me, to take judicial notice of the authority of the Diocesan Prelate, or Bishop of Porto Rico, to represent the Roman Catholic Church, in this or any other litigation, nor are we authorized to ascertain by any other means than evidence properly introduced on the trial, the relations sustained by the Franciscan Friars and the Dominican Friars to the Roman Catholic Church. It may be that they were orders or societies existing within the body of the church and controlled by the bishop and other ecclesiastical authorities, but it may be that they, like the Jesuits, and perhaps other Roman Catholic societies, held their own lands and property entirely independent of the church, and that neither the Pope nor the bishop had any control over them whatever. It is said that the bishops represent the church in their respective dioceses by virtue of the canons of the Catholic Church; if so, those canons must be proven like the by-laws of any other society; and judicial notice cannot be taken of them by this court. Nothing in the record shows the purport of these canons nor the authority of the bishop to represent the church. Nor has the Rev. Pedro María Berríos, who figures in the judgment, shown any authority whatever to appear or be recognized as "Apostolic Administrator of the Catholic Diocese of Porto Rico," as he is therein styled. If the church had any right to represent these monastic orders, or any authority to bring a suit in their behalf, or inherited from them any property or any claim against the Government, it was incumbent upon the plaintiff in this case to show that fact by evidence; the court certainly could not presume it. Search has been made in vain

through the record of this case for any evidence bearing upon this point; and the findings of fact, approved by a majority of the court, while taking a very wide range into the field of history and fancy, is silent on this important and vital point.

The plaintiff relies in this case to prove his title, on the concordat entered into by the Pope and the Queen of Spain on the 25th of August, 1859. An examination of that document will show that it is therein clearly recognized that the Government of Spain was at that time in possession of the properties which had been secularized and taken from the possession of the friars, among which are those included in this suit. It is unnecessary here to quote at large from these concordats, which can readily be referred to, and many sections thereof, being set out in full in the findings of fact hereinafter quoted. The Crown recognized a claim on the part of the church to the said properties and agreed, in lieu of surrendering the same to the church, to retain them and pay for them in 3 per cent bonds, or certificates of the public debt, which should not be transmissible, but should be held by the church, and the interest devoted to the maintenance of worship, and to the support of the clergy. No change whatever was made in the possession of the secularized property, and the agreement between the church and the Crown amounted to the settlement of a dispute which had been in existence for more than 21 years; and if either party failed to carry out the contract then and there made, neither the title nor the possession to the lands involved was thereby affected. If the church did not receive the bonds, or the proceeds thereof, to which it was entitled under the concordat, a claim could and should have been made against the Crown of Spain for what was justly due; but it could not be said that the church could therefore claim the property itself from the Crown, much less from a purchaser who had acquired the same in good faith long after the concordat had been made and ratified.

In fact, by section 7 of the concordat, it is provided that, after the bishops had made the estimate, etc., the bonds should

be issued for the full value of the properties "as well as for the market price or value of those which have been alienated after the concordat," clearly recognizing the right of the church to continue the alienation and sale of the properties, as it had continually done for 21 years previously.

Supposing the King of Spain is guilty of a breach of the contract, does that give the church of the friars, or the claimants of these lands, whoever they may be, the right to consider the contract broken, and follow the property into the hands of subsequent purchasers, and innocent purchasers at that? By no means. When the Crown of Spain attempted to convey, and did convey, to the Government of the United States the properties included in this suit, the latter Government had a right to presume that the Spanish Crown had a perfect title to the property conveyed, and should be considered in the same light as any other subsequent innocent purchaser for value. But the church in this case is not only attempting to follow the property from the possession of the Crown of Spain into that of the United States of America, but from that of the latter Government into the possession of The People of Porto Rico, the defendants in this case, and presumably into the hands of any individuals who may have purchased portions of the same from time to time since the title was acquired under the President's proclamation.

This view of the matter is the inevitable result and the logical sequence of the position taken by the plaintiff in this case and upheld by a majority of this court. A mere statement of it in plain language seems to me to be sufficient to show that it will not stand the test of legal analysis. Whether or not the church or the bishop, or any person acting in their behalf, ever received the bonds or the certificates of debt from the Spanish Government in accordance with the concordats heretofore referred to, does not appear from the record in this case. But it is a fact judicially known to this court from the public laws of the Kingdom of Spain and the province of

Porto Rico that annual appropriations were made for the support of the clergy and public worship, and for pensions to the dispossessed friars of one hundred dollars per annum, altogether amounting during some of the years just prior to the American occupation and the cession made under the Treaty of Paris, to nearly two hundred thousand dollars. This large and liberal appropriation, made from year to year by the Spanish Government and the Provincial Government of Porto Rico, was probably accepted in lieu of the bonds of certificates of the public debt which could have been claimed under the concordats by the Roman Catholic Apostolic Church or by the Communities of Friars or other ecclesiastical authorities, and was doubtless regarded as a fair settlement of any claims supposed to exist against the Government on account of the secularization of the monasteries and other property belonging to these brotherhoods. Indeed, it has been argued that, inasmuch as under the change of government the intimate relations existing between the church and the State have been dissolved and the support of the clergy and the Catholic worship has been discontinued, that some provision should be made to satisfy the losses thereby incurred by the church and its clergy. This argument is altogether fallacious and has no basis in sound reason or authority. At the time of the cession made by the Spanish Crown of these properties to the American Government it was well known that there was no union of any kind between the church and the State in the United States of America, and that neither our National Government, nor any state or territorial government existing or possible under our Constitution, could appropriate public moneys for the benefit of any church or to support any form of worship whatever. If the church or the clergy had suffered any damages by the events herein alluded to, the Pope or the bishop must look to his Catholic Majesty Alfonso the XIII, King of Spain, to right their wrongs or to redress their grievances. Certainly such an argument as this furnishes no basis whatever to sustain any right or title to the property involved

in this suit on behalf of the plaintiff and against the defendant herein.

In this case the defendant pleads the statute of limitations, which in this Island in real actions requires the lapse of thirty years, to bar the action. Civil Code P. R., article 1864. The friars were, as shown by the evidence of three aged witnesses, beyond a doubt, dispossessed of the convents, by the military forces of the Spanish Government, in the year 1838; and ever since that time it is claimed by the defendant that the Government, whether Spanish, American, or Insular, had been in adverse, peaceable and uninterrupted possession of all the property claimed.

The evidence clearly shows that all the property itself involved herein has been in such possession of the Government of Spain and the United States Government and the Government of The People of Porto Rico, since the year 1838, and no suit of any kind was ever instituted for its recovery against any Government or any person, so far as appears from the record, in any court whatever, before the 6th of June, 1904, when this action was brought. Whether the thirty-years' statute, or some other article of the Civil Code of Porto Rico, prescribing a shorter term, applies to the *censos* or *quintrents* claimed herein need not, in this opinion, be discussed. Certainly, if the claim of the plaintiff to these lands has been barred by the statutes of limitations, the claim to the *censos* has been also barred.

Unless there was some event which took the case out of the statute of limitations, the term of 30 years was complete in 1868; and it had run twice over before the American occupation, or conquest, on the 18th of October, 1898. What event happened in the meantime?

It is claimed that the concordats made between the Pope and the Queen of Spain were events of this nature and interrupted the running of the statutes. Let us see.

After the Communities of Friars had been abolished, and after the Spanish Government had taken possession of all

their monasteries and other property, by virtue of the "Laws of Ecclesiastical *Disamortización,*" the Friars of Santo Domingo and of San Francisco, which had long since been established in San Juan, Porto Rico, had of course to conform to the same laws. The secularization was carried into effect in the Island of Porto Rico, with the same strictness as in the Peninsula, and the Communities of Friars of Santa Domingo and San Francisco, which had previously existed in this Island, were not only abolished, and all their property seized by the Government, but they were ejected from their monasteries, by military force, as is stated by one of the witnesses introduced by the Roman Catholic Church, a man of more than eighty years of age, who testified that he had witnessed the said ejectment when he was very young, and remembers the same very well. After the Spanish Government had taken possession of all the properties of the said religious communities it alienated some of them, while those that were not sold, remained in its possession, the revenues and products of the same being freely utilized by the Government. Much eloquence has been expended in denouncing the laws under which spoliation of the church property was accomplished. With the policy and justice of the necessity of those laws we have nothing to do. It is a historical fact that such laws have been passed, not only in Spain but in Mexico, in England, Austria, Germany, France and other European countries, and they were deemed necessary, right and proper at the time. If the title passed under the secularization laws that is all that concerns us at present. On this point there can be no doubt.

These events—that is to say, the enforcement of the secularization laws—took place in the Island of Porto Rico, during the year 1838, and this state of affairs resulting therefrom continued for several years until long after the termination of the Carlist War. Later the Spanish Congress passed the act of the 8th of May, 1849, which was sanctioned by the Queen of Spain, Isabella II, by which law the Queen was authorized to enter into an agreement with the Holy See, for the purpose

of settling the matters pending between the Crown and the clergy, as well as all the questions pending between the church and the State, and the desired settlement was accomplished by means of the famous concordat on the 16th of March, 1851. The final paragraph of section 35, which treats of the maintenance of the Religious Communities of Women, whose properties had also been seized by the Government by virtue of the aforesaid laws of *Disamortización,* provides for the retention of their landed property by the Government, and the permutation of the same, at a fair value, into certificates of the public debt bearing 3 per cent annual interest, and that the proceeds thereof should be distributed by the several bishops among the convents according to their needs.

Section 38 makes provision for the maintenance of worship and the clergy in which the very first item is "the product of the properties which had been restored to the clergy" by former concordats, and which, by the way, had never been actually restored. Further provision was made in this same section for the permutation of the properties of the friars into like 3 per cent bonds of the public debt for the benefit of the monks whose property had been secularized. Other particulars were settled by this concordat which it is unnecessary to mention in this connection. There was also an additional agreement made with the Holy See by the Government of Spain on the 25th of August, 1859, under the authority granted to it by the law of the 4th of November previous, to conclude and ratify a convention with the Holy See, chiefly for the purpose of commuting the ecclesiastical properties, of whatever kind they might be, for intransmissible 3 per cent bonds of the consolidated public debt, and to exchange the rest for the revenues established for the maintenance of worship and clergy, for bonds of the same kind, if it should be convenient for the respective dioceses, while the church was to retain the right to acquire property, which right was stated in section 41 of the concordat, and the amount of the revenue which the church might acquire in future was not to be computed in

the dotation of the same. It is unnecessary in this connection to set forth at length the whole of this lengthy document.

This agreement was signed in Rome on the 25th of August, 1859, by the respective plenipotentiaries, and afterwards ratified by the high contracting parties on the 7th and 24th of November of the same year, and 10 years later was again confirmed and was ordered to be observed and complied with in all its parts, by a royal decree made on the 4th of April, 1869.

It is claimed by the Roman Catholic Church that the concordat of 1859 especially is the basis of its title to the property in controversy. If carefully examined it will be seen that no title is given the plaintiff by this concordat to any property whatever except the nontransferable bonds of the Spanish Government, and certain palaces, orchards, gardens and other property, not covering those included in this action; and more than all that, nothing in any of these concordats prevents the church or the Pope or his prelates from making claim against the Crown for any property unjustly withheld from them.

Then we see that these celebrated contracts had no such effect as to interrupt or prevent the running of the statutes of limitations. Nor is any law of Spain called to our attention which would prevent the church or the brotherhoods from bringing suits against the King or the Government of Spain to enforce their claims upon these lands if they had any. But not even a petition to the Crown is presented much less is a suit brought in any court whatever. From all that is shown the church had been satisfied in some other way for the loss of the property of which the friars had been deprived. This was doubtless by the large annual appropriations made for the support of the clergy by the Government of Spain as well as by the Provincial Government of Porto Rico.

The statute of limitations, as is shown by the record herein, has clearly run in favor of the defendant in this case, and that statute is properly pleaded by the defendant, and must be considered by the court. It would be useless to say, if it were

the fact, that the church, from time to time, made claims against the Government and endeavored to have them recognized by the King of Spain, or by the Cortes. Nothing short of a suit brought in a court of justice would stop the running of the stateute of limitations (article 1874 Civil Code), and nothing in the nature of law or fact is shown which would have prevented the church, the Pope, the bishops, or the friars, or whoever might claim these properties, from instituting a suit against the Government in the proper court having jurisdiction of such matters. Administrative suits against the Government were frequently brought under the Spanish system, and they were governed by peculiar rules of procedure applicable to them alone.

In considering the right, if such right existed, of the plaintiff in this case to follow the land which it claims from the Spanish Government into the hands of the United States, and further into those of The People of Porto Rico, the principles of law enunciated by the Supreme Court of the United States in the year 1897, may well be invoked. That court in the case of *Cessna* v. *The United States* (169 U. S., 186), uses the following pertinent language:

"In this respect the action taken was in harmony with the general rule of international law. It is the duty of a nation receiving a cession of territory to respect all rights of property as those rights were recognized by the nation making the cession, but it is no part of its duty to right the wrongs which the grantor nation may have heretofore committed upon every individual. There may be an exception when the dispossession and wrong of the grantor nation were so recently before the cession that the individual may not have had time to appeal to the courts or authorities of that nation for redress. In such a case perhaps the duty will rest upon the grantee nation, but such possible exception has no application to the present case and in no manner abridges the general rule that among the burdens assumed by the nation receiving the cession is not the obligation to right wrongs which have for many years theretofore been persisted in by the grantor nation. Because Mexico had, more than 20 years before the cession, forcibly taken from Dr. Heath land that was rightfully his and given part or all of it to other persons it does not follow that

when the United States accepted the cession they came into the obligations to do that which Mexico had failed to do, place Dr. Heath in possession and restore to him the land of which he had been thus wrongfully deprived. Such action if taken might well expose this Government to just claims for compensation in behalf of the subsequent grantees of Mexico, who apparently took no personal part in the wrongs to Heath. Dr. Heath may have had a claim against Mexico for those wrongs, but he failed to prosecute his claim in the way prescribed, and he cannot now make his failure to pursue such prescribed way a reason for enforcing a title which that nation had refused to recognize. So long as Mexico repudiated his claim to this tract his only course was direct appeal or through the intervention of this Government to seek compensation for the property of which he had been deprived. When this government accepted the cession of the territory it did not thereby assume an obligation to satisfy any pecuniary demands which he as an individual may have had against the Mexican Government. In other words, it took that territory bound to respect all rights of property which the Mexican Government respected, but under no obligations to right the wrongs which that Government had theretofore committed.''

It cannot be said that the church in the present case had no time to appeal to the courts or authorities of the Spanish Nation for redress. The wrongs suffered, if the complaint is correct, were of long standing, having occurred more than 60 years prior to the cession of the Island of Porto Rico to the United States, and to the transfer of the property claimed from the defendant by the Spanish Government to the United States Government.

. This Government by accepting the cession of the territory of Porto Rico did not assume an obligation to satisfy any pecuniary demands which ecclesiastical or other corporations or individuals within that Island had against the Spanish Government. The United States Government, and under it the Government of Porto Rico, succeeeded to the rights of the Spanish Government in that Island, bound to respect all rights of property which the Spanish Government respected, but under no obligation whatever to right the wrongs, if any, which that Government and committed.

It clearly appears that these correct principles of international law, applied to the case of Dr. Heath 10 years ago, are equally applicable to the case of The People of Porto Rico now and here.

The attorney for the plaintiff sought to bring to the attention of this court the action of the military government of Cuba, during the administration thereof by Major General Leonard Wood of the United States Army, as a precedent to be followed in the decision of this case. That incident has no value as a precedent or an authority in this court; for in the first place it was not based on the decision of a court, but of a board of arbitrators, and in the second place, the facts of the two cases are entirely different. By the Treaty of Paris. the King of Spain *cedes* the Government lands in Porto Rico to the United States and merely *relinquished* the title to those in Cuba. There is quite a difference in the terms used and it was thereby left for the Government in Cuba to make the best settlement it could with the church. But it did not relinquish possession to an inch of land, it merely settled a vexed question by the payment of large money bonus. This Congress can do to-day if it is thought just or politic; but this court has no power to arbitrate or settle vexed questions, but only to try this case and render judgment in accordance with the law and the facts.

If there were no other reason for dissenting from the judgment rendered in this case an all sufficient one is the lack of evidence to support it. An examination of the findings of fact, especially the third, fourth, fifth, sixth, seventh and eighth subdivisions thereof, made a part of the record herein, shows this inherent and fundamental defect.

It is unnecessary to encumber this opinion with a literal copy of these paragraphs, which can be found in the record, and will afford a complete understanding of the claims of the plaintiff, and which embody all of the evidence in support of the plaintiff's case which was introduced on the trial, and many observations, inferences and arguments which have no

proper place in the evidence or the findings of fact. It is needless to say more than merely to recur again to the principal reason which the writer has for dissenting from the judgment rendered.

The burden of proof is on the plaintiff to make out its case in this court by proper pleadings and sufficient evidence. In other words this plaintiff, like John Doe or Richard Roe, must recover upon the strength of its own title and not upon the weakness of the defendant's claim. The defendant can rely alone on its possession in the absence of title shown by the plaintiff. This simple elementary proposition needs no authorities to support it; but in order to show that in other cases it has been recognized as binding in this Island two cases decided by this court will be cited. They are *Bianchi* v. *Añasco,* 2 P. R. Rep., 484, and *Monviño* v. *Carreras,* 2 P. R. Rep. 581. Unless the plaintiff shows to the court by proper evidence that the property claimed belongs to it, the defendant must recover at least the costs of suit. The plaintiff in this case has not shown any title whatever to the lands or buildings in controversy, nor to the *censos,* quitrents or annuities and other property of that description.

There is no title of any kind shown, emanating from the sovereignty of the soil or from the Insular authorities, from the time of Ponce de Leon down to the American occupation, to the friars or any one else. It is said that there was a title to one of the brotherhoods by Ponce de Leon to some indefinite property, and it is surmised that it has probably been lost. But there is no proof in the record, nor mention in the findings, either of the existence of such a title, or the loss of the document which was evidence of the same. Both of these supposed facts are based on either guesswork or vague tradition. The concordats do not confer title on anyone, and indeed do not touch the title except to confirm it, if that were necessary, in the crown of Spain. They also provide for a compensation, supposed to be adequate, in the issuance of bonds, equal in amount to the value of the property, which had

been secularized by the Government, and remained unsold. No vendor's lien or other encumbrance is claimed or acknowledged in the concordats in favor of the church upon the lands claimed, and if the Spanish Government has failed to comply with the contract claimed to be set out in the concordats, the church or the friars must look to the Crown of Spain for relief, and not try to follow the lands into the hands of subsequent, innocent purchasers.

According to the views which are held and expressed above the judgment herein should have been rendered in favor of the defendant, The People of Porto Rico.